[No. 15378. Department Two. January 12, 1920.]

# H. S. Gile et al., Appellants, v. S. Tsutakawa et al., Respondents.[1]

Arbitration and Award (2)—Agreement to Arbitrate—Construction. An agreement to arbitrate any dispute arising as to the proper fulfillment of a contract for the sale of prunes does not submit to arbitration a dispute as to the proper construction of trade terms in the contract fixing the price to be paid.

Same (2)—Construction by Parties—Effect of Tender. A tender to arbitrate a dispute not submitted by the arbitration agreement would not have the effect of reading the same into the contract.

Sales (6, 19)—Parties—Relation to Transaction. A contract for the sale of a car load of prunes is not affected by the fact that by mistake one of the duplicate copies was made out on a printed form of another company.

Same (19)—Estoppel or Waiver. The purchasers of a car load of prunes are estopped to claim that their contract was with another company represented by the same broker, where, after the car was shipped and bill of lading and draft sent, they complained about the price, offering to pay part, and did not deny the contract.

Custom and Usage (6)—Evidence (159)—Parol Evidence of Trade Meaning. Oral evidence is admissible that the words "bulk basis" in a contract for the sale of a car load of prunes has a technical or trade meaning, generally known and recognized by the trade; especially when all the parties are connected with the trade, as they are conclusively presumed to know the trade language.

Partnership (36)—Rights and Liabilities of Partners—Sales. Where the buyer of a car load of prunes and the broker had a partnership interest in the purchase and the broker knew the trade meaning of the words "bulk basis" used in the contract, the buyer, as a partner, is conclusively presumed to have knowledge thereof.

Brokers (4)—Authority—Construction of Contract. A broker whose sole authority was to find a purchaser willing to buy a car load of prunes, has no authority to construe the contract or to bind the seller by representing to the purchaser that the term "bulk basis" used in the contract had any meaning other than its accepted trade meaning.

Appeal from a judgment of the superior court for King county, French, J., entered January 9, 1919,

[1] Reported in 187 Pac. 323.

upon findings in favor of the defendants, dismissing an action on contract, tried to the court. Reversed.

*Glenn C. Beechler* and *William H. Trindle,* for appellants.

*Melville Monheimer, Van C. Griffin,* and *Benj. S. Ohnick,* for respondents.

BRIDGES, J.—This was a suit by appellants for damages resulting from an alleged breach of contract on the part of respondents to purchase a carload of prunes. The complaint alleged that, on September 29, 1914, the plaintiffs and defendants entered into a written contract for the sale and purchase of a carload of prunes; that thereafter the plaintiffs shipped the prunes to defendants at Seattle, and they refused to take them, and that the plaintiffs were required to, and did, take possession of the prunes and sell them upon the open market at the best price they could obtain, but at a loss to them of something over $600, for which they sought judgment. The defendants, by answer, admitted that they had entered into a contract for the purchase of a carload of prunes, but that such contract was not with the plaintiffs, and that, in any event, the price charged by the plaintiffs therefor was in excess of the contract price, and for that reason they refused to pay the price demanded, but that, at all times, they have been able and willing to take the prunes at the agreed price, which they say they tendered to the plaintiffs, but that the tender was refused.

In order that the facts, which are somewhat complicated, may be more easily understood, it may be well here to give the relations of the various parties one to the other. The appellants, plaintiffs below, are copartners doing a general fruit business, with head offices at Salem, Oregon. There was also another Ore-

gon fruit concern named the Willamette Valley Prune
Association, which was a corporation, also having
offices at Salem, Oregon. The appellants owned sev-
enty-five per cent of the stock of the prune association,
and controlled and transacted most of its business.
Both the appellants and the prune association had
regular printed forms of contracts, and these forms
were of the same wording, or nearly so. The defend-
ants were copartners doing business as the Japanese-
American Commission Company. The defendant Jap-
anese-American Commission Company, a corporation,
was dismissed from the action. The American Trad-
ing and Brokerage Company, a Washington corpora-
tion, was the Seattle agent and broker for both the
Oregon fruit concerns, and one J. L. Elster was the
business manager of the Trading and Brokerage Com-
pany. One of the defendants was a stockholder in, and
officer of, this brokerage company, but had very little
knowledge of its business affairs. This brokerage
company had in its office at Seattle various copies of
the printed contract forms of both the Oregon fruit
concerns. The sale set out in the complaint was
negotiated by this brokerage company. The contracts
were drawn by the broker on the printed forms above
mentioned and were executed in triplicate; one of the
executed copies was on the printed forms of the plain-
tiffs, and the other two were on the printed contract
forms of the Willamette Valley Prune Association.
The contract gave a description of the prunes and the
prices therefor in the following words:

| | | | | |
|---|---|---|---|---|
| 25 | Bags Italian Prunes, size 20/30................... | at | 7c per lb. |
| 130 | Bags Italian Prunes, size 30/40................... | " | 7c per lb. |
| 100 | Bags Italian Prunes, size 40/50................... | " | 6c per lb. |
| 40 | Bags Oregon Petite Prunes (French) size 70/80... | " | 5c per lb. |
| 35 | Bags Oregon Petite Prunes (French) size 80/90... | " | 5c per lb. |
| 40 | Bags Oregon Petite Prunes (French) size 90/100.. | " | 5c per lb. |

Bulk basis.

This contract also contained an arbitration clause in part as follows:

"—any dispute arising as to the proper fulfillment of the contract to be settled by arbitration. . . : If the arbitrators decide that seller has not shown good faith in making delivery hereunder, the buyer shall be entitled to another tender in full compliance with this contract, or proper damages shall be awarded. Samples for arbitration shall be drawn from not less than three (3) per cent of shipment. No unimportant variation in the execution of this contract shall constitute basis for claim. In the event of failure of seller to ship, it shall be considered as a dispute to be submitted to and settled by arbitration."

It will be observed that the words "bulk basis" were used in this contract. It was contended by the plaintiffs that these words have a well understood, technical meaning in the prune trade, and that they form the basis for fixing the price of prunes, and, under the contract, the price or agreed value of the prunes sold was $3,105.77. The defendants, however, being without any knowledge that these words had a technical trade meaning, contended that the words "bulk basis," as used in the contract, should receive their ordinary meaning, to wit, that the prunes were to be shipped in bulk or in bags, and that, under the terms of the contract as so construed, the value of the prunes was a little less than $2,500. The testimony shows that, at the time the contract was entered into by the defendants, Mr. Elster, the manager of the brokerage company, informed them that the words "bulk basis," used in the contract, had nothing to do with the fixing of the prices of the prunes, but meant that they were to be shipped in bulk or in bags and that the carload of prunes which the defendants were contracting for would be worth not to exceed $2,500. It further appears that, before this contract was signed by the de-

fendants, there was an agreement between them and Mr. Elster that, if 'defendants would purchase a carload of the prunes, Mr. Elster would help them dispose of the shipment and that the net profits would be equally divided between them. The defendants, being unfamiliar with the prune trade, and relying on the representations made to them about the meaning of the words "bulk basis," and also because of the agreement that Elster would assist them in disposing of the prunes, executed the contract. The appellants, however, had no knowledge that these representations had been made by Mr. Elster, or of the agreement between the defendants and Elster concerning the disposition of the prunes. When the carload of prunes arrived at Seattle from Oregon, the plaintiffs demanded of the defendants $3,105.77 as the contract price therefor. This the defendants refused to pay, but tendered $2,500, which was refused. The parties were unable to get together on the price, and as a result the plaintiffs were required to, and did, repossess themselves of the carload of prunes, and placed the same in the hands of responsible brokers in Seattle for the purpose of disposing of them, and thereafter, in due course, they were disposed of at the market price, but at a loss to the plaintiffs, under the "bulk basis" price, of some $600. The testimony shows that the price of prunes is figured on eighty prunes to the pound and that this is the base; this base moves up and down according to the size of prunes over or under eighty to the pound; this movement is one-half cent per pound on each ten points up or down, the larger the prune, the greater is its value. The foregoing is an illustration of the trade meaning of the words "bulk basis."

The case was tried to the court without a jury, and, among other things, the trial court found that to the

trade the term "bulk basis," used in the contract, had a well known technical meaning and the price of various sizes of prunes was fixed thereby. The court further found that there was no meeting of the minds of the parties and, consequently, there was no contract, and that it was the duty of the plaintiffs to have offered arbitration before they finally disposed of the prunes, and that, having failed to do so, they could not maintain this action. The court further found or concluded that defendants were chargeable with constructive notice of the meaning of the term "bulk basis," as used in the prune trade. There was a judgment dismissing the suit, from which judgment this appeal is taken.

It is first contended by the respondents that the action was properly dismissed because the appellants did not seasonably offer to comply with the contract provision with reference to arbitration. In our opinion, the arbitration clause does not have any reference to such a dispute as is involved here; that clause provides that "any dispute arising as to the proper fulfillment of this contract shall be settled by arbitration." It is not claimed here that the appellants did not properly fulfill their contract. There is no dispute but that the shipment was made at the time and in the manner provided, and that the prunes were of the character represented and the quantity contracted for. The only dispute here is concerning the amount to be paid under the terms of the contract. This has nothing to do with the fulfillment of the contract, and therefore such dispute does not come within the arbitration provision. But, it is said by respondents, that appellants have construed the contract themselves to mean that they were under obligation to submit this controversy to arbitration, because they finally tendered arbitration before suit was brought. This reasoning

carries one entirely too far. The contract did not require the arbitration of this dispute, and the belated tender of arbitration could not have the effect of reading such a provision into the contract. The appellants' offer of arbitration may well have been made out of extraordinary precaution, or for the purpose of avoiding litigation, and not with the view that it was required by its contract to arbitrate.

Respondents further contend that there was no binding contract because, of the three copies executed, two were upon the printed contract forms of the Willamette Valley Prune Association and one on the printed form of the appellants. As previously indicated, the brokerage company which negotiated this sale was the broker of both the appellants and the prune association, and it had in its possession numerous blank forms of contract of both of these concerns. The manager drew the contract between the parties hereto, using the blank printed forms for that purpose. The testimony shows very clearly that the use of the printed forms of the Willamette Valley Prune Association was simply a mistake, and that there was a contract between the appellants and respondents, and that there was no contract between the respondents and the prune association. The mere fact that some of the duplicate copies of the contract were, by mistake, made on the printed forms of the Willamette Valley Prune Association cannot relieve respondents of any liability to the appellants. Besides this, the actions of the parties show the contract was with the appellants. After the car had been shipped, the appellants sent a bill to respondents and sent a draft to the bank, which was presented to respondents. They wrote appellants' attorney, complaining about the price and agreeing to honor the draft to the amount of $2,500, but did not claim that they had not made any contract with the

appellants. They even went so far as to tender the bank which held the draft the amount of money they contended was due. In fact, they seem never to have denied that the contract was with the appellants until about the time of this suit. From their actions respondents are estopped to claim they did not contract with appellants.

There is some contention that the appellants were not entitled to introduce testimony for the purpose of showing the technical meaning of the words "bulk basis," for the reason that those words were not obscure in their meaning and that they meant shipment in bulk, and that respondents, being ignorant of any trade meaning of the words, are entitled to have the words receive their usual and common meaning.

The authorities are numerous which recognize the rule that words used in a contract may be shown by parol testimony to have a technical or trade meaning, provided it be further shown that such meaning is not local but is generally known to, and recognized by, the trade. This oral testimony does not tend to vary or contradict the written contract, but merely explains it, so that the court may give the contract the meaning intended by the parties. *Cormier v. Martin Lumber Co.*, 98 Wash. 463, 167 Pac. 1105; *Pacific Coast Elevator Co. v. Bravinder*, 14 Wash. 315, 44 Pac. 544; *Miller v. Wiggins*, 19 Am. & Eng. Ann. Cas. 942; 17 Cyc. 685; Jones, Evidence (2d ed.), § 456; 1 Elliott, Evidence, § 608; 2 Wharton, Evidence (3d ed.), § 962. And the foregoing is the rule even where the words might be given their customary meaning and still leave the contract intelligible,. particularly when all parties to the contract are connected with the trade, for every person connected with the trade is presumed to know the technical meaning of trade words or terms. See above authorities; also *Meighen v. The Bank*, 25 Pa. St. 288;

*United States Life Ins. Co. v. Advance Co.,* 80 Ill. 549; *Armstrong v. Chemical Nat. Bank,* 83 Fed. 556; *Baer v. Glaser,* 90 Mo. App. 289; *Soutier v. Kellerman,* 18 Mo. 509; *Daniel v. Maddox-Rucker Banking Co.,* 124 Ga. 1063, 53 S. E. 573; *Williams v. Burdick,* 63 Ore. 41, 125 Pac. 844, 126 Pac. 603.

From these conclusions, it should logically follow that one dealing in a business or trade must be conclusively presumed to know and understand the language of such trade or business, when it is shown that such language is generally used and known in the trade, and his ignorance will not protect him, unless knowledge of such ignorance be brought home to the party with whom he is dealing. To hold otherwise would be to condemn long established customs and make uncertain and unstable contracts made in accordance therewith. We think that, under the circumstances of this case, the respondents were conclusively presumed to have entered into the contract with knowledge of the trade meaning of the words "bulk basis." But there is another reason why respondents must be conclusively presumed to have knowledge of the trade meaning of those words, and that is, that there was an arrangement, as above noted, between the respondents and Elster, the broker, whereby they, in effect, became partners in this transaction, and the trial court justly found that Elster had actual knowledge of the trade meaning of these words. Under these circumstances, the knowledge of Elster would be the knowledge of the respondents. It was doubtless upon this theory that the trial court found that respondents had constructive notice of the trade meaning of the words.

But the respondents contend that the appellants are bound by the meaning of the words "bulk basis" as given by their broker, Elster, to them that the words, in effect, meant shipment in bulk or sacks. A broker

is one who is engaged for others on a commission to negotiate contracts relative to property with the custody of which he has no concern. 9 C. J. 508; 4 R. C. L. 242. Of course, the broker's principal may give him more extensive powers, but there is no evidence in this case tending to show that Elster, the broker, had any greater powers than those above mentioned. His sole authority was to find persons willing to purchase the appellants' prunes upon terms and conditions fixed by appellants. He would not have any authority to change or modify the appellants' terms or prices, nor would he have any authority to construe appellants' contracts in such a way as to bind appellants. 4 R. C. L. 269; 9 C. J. 525, 526. We therefore hold that the broker went beyond his authority and power when he undertook to construe the appellants' contract, and the appellants are not bound by anything the broker may have said in that regard. But if it should be held that ordinarily the representations of the broker as to the meaning of these words would be binding upon the appellants, they could not be so here, because there was, at least, a limited partnership between respondents and Elster, and the representations made by Elster to respondents were representations made by one partner to another.

The conclusions to which we have come induce us, not only to reverse the case, but to direct the trial court to set aside its findings, conclusions and judgment, and make new findings, conclusions and judgment in accordance herewith, and which will give to appellants a judgment for the full amount they sue for, less any commissions which they may have paid to persons disposing of the car of prunes.

It is so ordered.

Holcomb, C. J., Mackintosh, and Mount, JJ., concur.