[No. 24767. Department One. January 9, 1934.]

UNITED FIG & DATE COMPANY, *Respondent*, v.
M. J. FALKENBURG, *Appellant*.[1]

[1]Reported in 28 P. (2d) 287.

*Eggerman & Rosling,* for appellant.

*Kahin & Carmody* and *Orlo B. Kellogg,* for respondent.

MITCHELL, J.—On or about October 7, 1926, the United Fig & Date Company, of Chicago, and M. J. Falkenburg, trading and doing business under the trade name of Falkenburg Trading Company, of Seattle, executed and delivered, each to the other, a contract, partly in printing and partly in typewriting, in words and figures as follows:

"United Fig & Date Company October 7, 1926.
"Chicago, Illinois.
"Dear Sirs:
 "We confirm trade with you as follows:

SELLER Falkenburg Trading Company, Seattle, Washington.

BUYER United Fig & Date Company, Chicago, Illinois.

BROKER Messrs. A. U. Pinkham & Co., Seattle, Washington.

COMMODITY Walnut Meat Halves.

QUALITY Light dry-cracked Chinese Walnut Meat Halves, 1926 crop, including 10 per cent amber Halves packed separately.

QUANTITY 250 cases: 225 cases light Halves and 25 cases Amber Halves.

PACKING Packed in strong wooden cases lined with heavy wrapping and waxed papers containing 55 lbs. net each.

SHIPMENT December/January/February shipment from source.

PRICE 30c per lb. f. o. b. cars Seattle, in bond.

WEIGHTS Oriental net packed weights.

TERMS OF Sight draft with shipping documents at-
PAYMENT tached, payable upon arrival of Walnut
Meats at Chicago.

INSURANCE

INSPECTION Immediately upon arrival in Seattle by
Falkenburg & Company.

REMARKS Shipment to be made immediately after
arrival of the Walnut Meats. In case Buyer
should not desire to have shipment made
immediately after arrival of Walnut Meats
in Seattle, Seller will have the right to
properly warehouse the Walnut Meats in
Seattle in bond at Buyer's expense and
draw upon the Buyer with negotiable
Warehouse Receipt attached to draft and
Buyer agrees to pay said draft upon pres-
entation.

(Signed)
Buyer United Fig & Date Company
 By P. Costa.
 (Signed).
 Seller Falkenburg Trading Company
 By N. J. Falkenburg,
 President.''

On or about October 12, 1926, the parties entered
into another contract which, except as to the price of
the goods, was identical with the contract of October
7, 1926.

On the reverse side of each contract appeared cer-
tain printed provisions, made a part of the contract,
as follows:

"All sales of imported merchandise are subject to
its safe arrival at port of entry.

"Rejection by buyer, if accepted by seller, consti-
tutes delivery. However when a rejection is left un-
contested by the seller or is sustained as a result of
arbitration, seller shall have the original contract
period in which to tender other lots, if he so elects."

After the time for performance of the contracts arrived, namely, February, 1927, the seller notified the buyer that it was tendering certain walnut meat halves which, according to examination and report of the seller's own chemist and inspector, were twenty per cent moldy and not of merchantable quality. The seller contended the buyer was obligated to accept the goods or to reject them, and, upon the refusal of the buyer to take delivery, the seller notified the buyer that it, the seller, accepted the buyer's rejection of the goods, and that the seller's obligations under the ·contracts were at an end. The seller failed or refused to supply walnut meat halves of merchantable quality, although it appears such goods could have been had on the Seattle market at that time.

The market price, f. o. b. Seattle, walnut meat halves, called for by the contracts, at the time performance was due and refused, was greater than the contract prices. The buyer, United Fig & Date Company, brought this action to recover damages for the breach of the two contracts. Upon a trial to the court without a jury, findings of fact, conclusions of law and judgment were entered in favor of the plaintiff. The defendant has appealed.

Admitting that, under the uniform sales act, a warranty of quality would be implied, and admitting that merchantable goods were not tendered in this instance, appellant, in answer to its own question, "Why, then, is not the judgment against him correct?" says:

"It would be if these were all of the facts, but in this case, the parties have expressly contracted for a particular remedy. The contract provides that if the buyer rejects the walnut meats and the seller accepts the rejection, then the contract is terminated, reserving to the seller only, the option at his election of furnishing other walnut meats."

The section of the uniform sales act relied on is Rem. Rev. Stat., § 5836-71. It provides, in effect, that any right, duty or liability arising under an express contract of sale or a sale by implication of law may be negatived or varied by express agreement, which, it is claimed, expressly contemplates the right to *terminate* an existing contract without liability, as was done in this case, by the provision in the contract: "Rejection by buyer, if accepted by seller, constitutes delivery." In our opinion, the statute relied on furnishes neither aid nor detriment to appellant's construction of this language in the contracts, which, of itself, means or does not mean what appellant insists upon.

Its contention as to the meaning of this clause in the contracts was brought out by the testimony of so-called expert witnesses, who, testifying over the objections of the respondent as not being a matter of expert opinion, said that the tender of non-merchantable goods rejected by the buyer and the rejection accepted by the seller constituted a *termination* of the contract. More precisely, counsel's argument in that respect is:

"Five expert witnesses testified as to its meaning and to its extensive use. Two more witnesses were present in the courtroom and an offer of their testimony was rejected. All agreed that under this clause the contract in question was terminated. *Not a single witness testified to the contrary.*"

And still further in this respect, appellant argues that it amounted to "a termination of the contract and a wiping out of all rights and liabilities between the parties"; that is, conduct which the contract says "constitutes *delivery*" means a *termination* of the contract without any existing right or liability between the parties to that contract.

The objection to the testimony of the experts should have been sustained, but it is enough that, in the final opinion of the court, it was not allowed to affect the result. The testimony was in the face of the plain language of the contract. There is nothing ambiguous or hidden about the plain English words "constitutes delivery," as applied to this case, that the court does not understand without the testimony of those who claim that the words mean something decidedly different from the plain import of the language.

In support of the admissibility and purpose of the expert testimony, appellant calls attention to *Gile v. Tsutakawa,* 109 Wash. 166, 187 Pac. 323, wherein the words "Bulk Basis" were used in a contract for the sale of a carload of prunes, and *Cormier v. Martin Lumber Co.,* 98 Wash. 463, 167 Pac. 1105, which involved a contract of employment on a "straight time" basis in the logging industry. Clearly, however, those words or terms were properly held to be technical in relation to particular trades, justifying expert testimony, but whatever may have been said with respect to those phrases does not justify the claim that the language in question in the present contracts means, or has any tendency to show, what manifestly it does not mean.

When we consider the generally accepted rule, now expressed in Rem. Rev. Stat., § 5836-15, subd. 2, that, where goods are bought by description from a seller who deals in goods of that description, there is an implied warranty that the goods shall be of merchantable quality, then the language of these contracts we are now considering becomes plain as covering the case of *a buyer who rejects goods tendered that are of the character called for by his contract.* Goods of that kind were not tendered under these contracts.

 Under another assignment of error the provision with respect to the safe arrival of the goods at the port of entry, printed on the back of each of these contracts, is relied on by the appellant. However, all of the contract, in each case, must be considered in ascertaining the meaning and intention of the parties, and, in doing so, we must bear in mind those provisions of the contract which appear in typewriting as being immediately and newly prepared for this particular contract. By these provisions, the goods were to be inspected by the appellant upon their arrival in Seattle; the buyer could then control the movement of the goods by having immediate shipment to Chicago, or by having them stored in Seattle at the buyer's expense; and prices fixed at thirty cents per pound, f. o. b. Seattle.

There was no provision in the contract nor other proof that the respondent should pay all or any portion of the transportation or insurance costs from the Orient to Seattle or otherwise take part in the shipment; nor was there any written contract or other proof of any purpose, intent or attempt on the part of the seller to appropriate or set apart any individual or particular goods in performance of these contracts or either of them, prior to contemplated delivery f. o. b. or storage in Seattle. How, then, shall it be said that these particular goods were sold to the respondent, when there is not a scintilla of evidence even tending to connect these goods with the contracts until after the damage occurred and was discovered by the appellant?

 Appellant offered in evidence a letter from the respondent, occurring in former correspondence between them, wholly disconnected from the present contracts, in which the respondent declined to agree in future dealings "to leave the option entirely up to you

as to whether or not you care to replace the shipment.'' The refusal to allow the letter in evidence is assigned as error. The ruling was correct. The question of replacement of shipment was in no way involved in this case; and besides, respondent's position on that subject, as expressed in its correspondence, in no way tended to qualify its right asserted in this action to damages for breach of the contracts.

For reasons already stated, and because it was cumulative, there was no error in refusing to reopen the case and receive an offer in the nature of expert testimony of two other witnesses as to the meaning of the words, ''Rejection by buyer, if accepted by seller, constitutes delivery.''

Finally, it is claimed error was committed by the trial court in denying appellant's motion to dismiss the action for the failure of respondent to diligently prosecute it. This matter was presented to the trial court at the call of the case for trial, and also prior thereto, and was considered and disposed of largely upon affidavits for and against the motion. Upon due consideration of the record, including the affidavits, we find and conclude there was no error in denying the motion.

Judgment affirmed.

BEALS, C. J., MAIN, MILLARD, and STEINERT, JJ., concur.