[No. 31133. Department Two. August 31, 1950.]

MARSTON BALL et al., *Respondents,* v. STOKELY FOODS, INC., *Appellant.*[1]

[1]Reported in 221 P. (2d) 832.

*Eggerman, Rosling & Williams* and *Joseph J. Lanza*, for appellant.

*Ward & Barclay*, for respondents.

ROBINSON, J.—These were five separate actions, consolidated for purposes of trial, brought by pea growers in Skagit county, against Stokely Foods, Inc. Plaintiffs sought to recover damages allegedly sustained as a result of defendant's delay in harvesting their peas during 1947. From verdicts and judgments in favor of plaintiffs, defendant has appealed.

The suits are predicated upon written contracts, which are substantially identical in terms. They provide that the seller, or grower, should cultivate, for the benefit of the buyer, Stokely, specified quantities of peas. They read further:

"It is understood and agreed that all peas shall be planted, cut, and delivered when so ordered by Buyer or Buyer's representatives. . . .

"When these peas are ready for harvest, it is understood and agreed that the peas sold hereunder shall be mowed, hauled to viners and vined by buyer, provided however that Seller shall pay Buyer the sum of $25.00 per ton for said mowing, hauling and vining. Seller is to be paid only for the weight of peas after vining and deducting the weight of all dirt, pods and leaves that carry over with the peas or peas that will pass through a 10/32 inch mesh screen, and all peas that are over mature. Regardless of Buyer taking possession of said peas at the time of mowing, it is clearly understood that the intention of the parties hereto is that delivery will not be complete until said peas are graded and accepted at Buyer's plant in accordance with the terms of this contract."

There then follows a schedule setting up eight price grades for payment to the grower. These are based upon "tenderometer" readings, ranging from 91 to 140. The tenderometer is a machine which determines the hardness of the pea, the harder the pea, the higher the number shown on the tenderometer reading, and the lower the quality of the pea. This schedule reads as follows:

| "TENDEROMETER READINGS | | |
|---|---|---|
| "From | To & Including | |
| 0 | 90 | $          per ton |
| 91 | 95 | $ 115.00 per ton |
| 96 | 100 | $ 105.00 per ton |
| 101 | 105 | $ 100.00 per ton |
| 106 | 110 | $  90.00 per ton |
| 111 | 115 | $  70.00 per ton |
| 116 | 120 | $  60.00 per ton |
| 121 | 130 | $  40.00 per ton |
| 131 and over   Buyers Option | . | $          per ton" |

It appeared from the evidence that peas are customarily divided into grades based upon this schedule. Thus, peas with a tenderometer reading of from 91 to 95 are rated Grade A; from 96 to 100, Grade B; from 101 to 105, Grade C; from 106 to 110, Grade D; from 111 to 115, Grade E; from 116 to 120, Grade F; from 121 to 125, Grade G; and from 126 to 140, Grade H.

The contracts also contained the following provision:

"In case of fire, strikes, or other labor disturbances, lack of transportation facilities, shortage of labor or supplies, perils of the sea, floods, earthquakes, action of the elements,

invasion, war, riot, insurrection, rebellion, interference of civil or military authorities, or passage of laws, or any unavoidable casualty or cause beyond the control of Buyer, affecting in any way the conduct of Buyer's business or freezing operations, Buyer will be excused from performance hereunder. . . ."

Peas increase in hardness as they mature on the vine, and the essence of each of these complaints is that Stokely delayed harvesting of the peas beyond the time contemplated by the parties to the contract, which, it was alleged, would have been when the peas had reached an average grade of B. The result of this delay was that the peas, when harvested, were mostly in the low grades, and the plaintiffs, respondents here, received much less money for them than they would have received had the peas been harvested earlier. It is the contention of Stokely that the contracts imposed no obligation upon it to harvest the peas at any particular time. Respondents, on the other hand, urge that Stokely was required to do this when the peas were "ready for harvest," and the court instructed the jury to this effect, saying:

"The contracts in these cases now before you impose a duty upon the defendant to harvest the plaintiffs' crop of peas when the crop is ready for harvest, unless labor shortage beyond the defendant's control, action of the elements, or acts of the plaintiffs themselves, excuse performance of such duty. If you find that the defendant in any or all of these cases failed to harvest the crop when ready for harvest, and if you further find that its failure to do so was not excused by any labor shortage beyond the control of the defendant, action of the elements, or by any act of the plaintiffs themselves, then the defendant's failure to harvest the peas when they should have been harvested would constitute a breach of contract, and your verdict should be for such plaintiff or plaintiffs."

Appellant urges that the sentence in the contract beginning, "When these peas are ready for harvest, it is understood and agreed that the peas sold hereunder shall be mowed, hauled to viners and vined by buyer, . . ." does not establish the time when the peas are to be harvested, but merely fixes the party who is to perform the necessary

harvesting acts, *viz.*, the buyer. If appellant's construction of this sentence were to be adopted, however, the opening clause would be no more than surplusage. Apart from the familiar canon in the interpretation of contracts that every word and phrase must be presumed to have been employed with a purpose and must be given a meaning and effect whenever reasonably possible (*Clark v. State Street Trust Co.*, 270 Mass. 140, 169 N. E. 897; *Hollingsworth v. Robe Lbr. Co.*, 182 Wash. 74, 45 P. (2d) 614), to conclude that this clause is mere excess would not be in accord with the facts and circumstances of the case as a whole. From the evidence, it is apparent that the time of harvest is a matter of vital concern to the pea farmer. A delay in the harvest results in harder peas, and a correspondingly reduced financial return to him; indeed, as happened in the present instance, it may even result in an overall loss.

■ ▮ It is a well-established rule that, where one construction would make a contract unreasonable or such as prudent men would not ordinarily enter into, while another, equally consistent with the language, would make it reasonable, fair, and just, the interpretation which makes it a rational and probable agreement must be adopted. *Jacobs v. Teachout*, 126 Wash. 569, 219 Pac. 38; *Kandoll v. Penttila*, 18 Wn. (2d) 434, 139 P. (2d) 616; *Cohn v. Cohn*, 20 Cal. (2d) 65, 123 P. (2d) 833. Application of this principle leads to the conclusion that, in the instant case, respondents' interpretation of the contract is the correct one.

Appellant contends, however, that the prior provision of the contract, to the effect that "all peas shall be planted, cut, and delivered when so ordered by Buyer or Buyer's representatives," gives the buyer the right to decide when the peas should be harvested. In *Yeremian v. Turlock Dehydrating & Packing Co.*, 30 Cal. App. (2d) 92, 85 P. (2d) 515, a contract between a grower and buyer of grapes contained the following language:

"Grower to pick fruit starting on or about Oct. 1, 1935, and thereafter at such times and in such quantities as buyer directs."

But the court said that evidence was properly received for the purpose of reconciling this provision

" . . . with the right of the plaintiff to have his entire crop delivered at a time, and in a manner which would, in the ordinary practice of good husbandry, return to plaintiff his selling price, based upon the harvest of the crop, within a period of time that would permit the harvesting of the greatest quantity of grapes";

and it concluded that the contract should not be given an interpretation

" . . . which would give the buyer the right to arbitrarily refuse delivery of grapes which met the standard requirements of the contract, by failing to supply boxes in sufficient number to permit the crop to be harvested within a reasonable time."

See, also, *Alvernaz v. H. P. Garin Co.*, 127 Cal. App. 681, 16 P. (2d) 683, upon which the court in the *Yeremian* case relied.

In any event, nothing in the provision suggests that it was not the obligation of the buyer to order the delivery of the peas at the time when they were "ready for harvest"; and, in view of this latter provision in the contract, we are constrained to conclude that the contract did impose this obligation upon him. The court's instruction, on the matter above quoted, therefore, would seem to have been entirely correct.

But appellant asserts, and rightly so, that nothing specifically included in the written contracts required Stokely to harvest the peas when they were at the top three grades, and urges that respondents have no just cause to complain because they were harvested at a later date. However, the solution to this problem would seem to depend upon the interpretation the jury felt should be given the term "ready for harvest." It is clear that the exact meaning of this phrase does not appear from the context of the contract.

■ While parol evidence will not be admitted to contradict, or vary, the terms of a written instrument, it is always admissible, in case of ambiguity, for the purpose of ascertaining the sense in which the parties intended to use

the ambiguous term or terms. *Darling & Co. v. Frank Carter Co.*, 208 Wis. 222, 242 N. W. 519. In order to determine whether the crops were considered to be ready for harvest, it was necessary and proper to produce extrinsic evidence tending to show when that time would arrive. Such evidence did no more than explain the contract, and was admissible in order that the jury might be assisted in ascertaining the meaning intended by the parties themselves. See *Murphy v. Schwaner*, 84 Conn. 420, 80 Atl. 295; *Ganson v. Madigan*, 15 Wis. 158, 82 Am. Dec. 659; *Klueter v. Joseph Schlitz Brewing Co.*, 143 Wis. 347, 128 N. W. 43, 32 L. R. A. (N.S.) 383; *Gile v. Tsutakawa*, 109 Wash. 366, 187 Pac. 323.

■ In their complaints, respondents alleged "that the said crop, if harvested when ready for harvest, would have yielded to plaintiff an average return of B grade of peas." There was ample evidence in the record from which the jury could have found that this was the interpretation the parties placed on the term "ready for harvest." Marston Ball, one of the plaintiffs, testified as follows:

"Q. Mr. Lanza asked you when those peas were ready for harvest, what is your answer? A. When they were B's. Q. An average B? A. That is right."

Robert Henry, who had been assistant field man for Stokely's in 1947, testified to this effect:

"Q. Do you know when a pea was considered ready for harvest in 1947? A. Yes. I think I do. Q. And when was that at what stage? A. Well, in my opinion, the first three grades, and possibly to include the first four. Of course, if you include the first four — I mean in my opinion this thing can be done right on the beam; I mean, the aim, of course, was to get the peas in the first three brackets, I suppose. Q. That would be in the A, B, and C brackets? A. That would be my opinion from what I was told and had been led to believe. Q. Can you answer why that would be the time the pea would be ready to harvest? A. I think it is a twofold proposition. First of all, it is the kind of pea that the packer wanted, that is, the market conditions were such that he was in need of a quality pea in order to sell. Second, it was the kind of pea that the farmer could make the money on. Q. That is the top three grades, is that correct? A. I would say so, yes, that would be my opinion."

The testimony indicated that, whereas, in 1946, the processors had been chiefly concerned with getting a large quantity of peas, in 1947 they were principally interested in getting peas of higher quality, and that this was reflected in the price schedules set forth in the contracts with the growers. Alex Gordon, who was plant manager for Stokely's Bellingham plant in 1947, testified, on cross-examination, as follows:

"Q. Now, Mr. Gordon, you had sent instructions to your field men to secure as high a quality pea as possible, is that correct? A. Yes. Q. That was what you wanted in 1947? A. Yes. Q. That same thing was not true in 1946, was it? A. No, not to the same extent. Q. In 1946 weren't you after quantity rather than quality? A. No, I wouldn't say that. We have always been after quality. Q. But you were also after quantity, more so than in 1947? A. More so in 1946 than in 1947. Q. In making up the contracts with the growers in 1947 you put a premium on quality peas? A. I did not. Q. Well, the company did put a premium on quality peas? A. Yes. Q. And that was done because you wanted the growers to send you peas in the top grades, and it was made profitable to them to raise high grade peas, isn't that right? A. I suppose so. Q. And you did not want G and H peas? A. Not if it was possible. Q. For that reason the price was set down to $40.00 and $50.? A. Yes. Q. So that the growers would be penalized if they did not raise top quality peas, is that correct? A. Yes."

It is true that there was evidence to controvert this testimony. Martin Olson, Stokely's field man, testified that it probably would have been impossible, even with plenty of help, to average a B grade for everyone; and Alex Gordon, on the day following the day on which he gave the above-quoted testimony, stated, on redirect examination, that he did not think he should answer whether or not the price range going down to forty dollars per ton was intended to penalize anyone ("I am not a judge of that"); and stated further that, if he had previously said anything to the contrary, he must have misunderstood the question. Nevertheless, the jury had the right to weigh all of the testimony on the matter and reach its own conclusions. There having been evidence to support a decision that it was understood

between the parties that "ready for harvest" would mean a time when the majority of the peas were in the top three grades, we cannot question the right of the jury to put that interpretation upon the contract. The court's instructions Nos. 4 and 6 permitted them to do so.

Appellant urges that this could not have been the intention of the contracting parties, for the reason that the price schedule specifically provides rates of payment for peas ranging to and including Grade H. However, if prevented from timely harvesting by one of the circumstances specified in the excusatory clause, appellant might well have been justified in harvesting the peas past maturity, and, in such a situation, would not, of course, be liable to the same extent as if they had been harvested in the higher grades. In any case, it is clear from the testimony that minor variations in soil and elevation, even on the same farm, would render it unlikely that, at whatever time the peas were harvested, they would all be in the same grade. The jury could easily have found, under the contract, that the peas should have been harvested when most of them were at a comparatively high rating, even though some others, in the same field, might have rated G or H at the time.

Appellant objects to an instruction by which the jury was told that, even if there was a labor shortage at harvest time, this would not relieve Stokely from liability if the labor shortage

". . . resulted from the defendant's own mismanagement or from improper planning on the defendant's part, or from any other cause which the defendant could have reasonably prevented by proper management and planning."

The objection is that this issue was not within the pleadings. But the contracts, copies of which were attached to the complaints, stated that, "in case of . . . shortage of labor . . . . *or any unavoidable casualty or cause beyond the control of the buyer*," the buyer should be excused from performance.

Under the doctrine of *"noscitur a sociis,"* the meaning of words may be indicated or controlled by those with

which they are associated (*Nunner v. Erickson*, 151 Ore. 575, 609, 51 P. (2d) 839, 852; 3 Williston on Contracts 1780, § 618); and applying this maxim, it does not seem unfair to assume that the parties would not have intended this excusatory clause to apply to a situation where a labor shortage was caused as a result of Stokely's own mismanagement. Appellant, in its answers (in language which differed slightly from case to case), pleaded, by way of affirmative defense, as follows:

"That if the peas of plaintiff were not timely harvested, and if plaintiff sustained any damages on account thereof, the same was due entirely to causes beyond the control of defendant, viz., unusual and abnormal dry and hot weather conditions causing said crop of plaintiff to mature much sooner than was normally expected, combined with a shortage of labor adequately to take care of the harvesting of plaintiff's peas, despite diligent efforts on defendant's part to procure sufficient laborers to harvest said crop."

In their replies, respondents denied these allegations. This raised an issue not only as to the fact of the existence of the labor shortage, which was disputed, but also as to whether or not such labor shortage, if any, had been brought about as a result of causes which the appellant could reasonably have prevented.

Appellant also argues that the evidence was insufficient to justify presentation of this issue to the jury. This, however, was not the case. There was, for example, evidence that Stokely had originally made a request from the local farm labor office for fifty Mexican laborers, and that subsequently it had reduced its order to thirty. It was the position of Stokely that it was told that fifty men would not be available, or at least that the suggestion was made that it should reduce its request to the lowest number of men practicable; but Mrs. Lattimer, the office placement woman for the farm labor office, testified that she knew nothing of this, and that had Stokely asked for more men every effort would have been made to obtain them. Again, the issue presented was one of fact for the jury, and the instruction submitting it was proper.

■ Appellant strenuously objected to the introduction of testimony and other evidence tending to show that, by reason of necessary expenses and deductions, respondents Vogler and Schroeder lost money on their 1947 pea crop. This evidence was not admitted to prove damages, but to show that the pea farmers lost money if their peas were harvested after they had been allowed to grow hard. As bearing on the probable understanding of the parties concerning the time when the peas were to be harvested, perhaps the most significant of the issues in the case, it would seem that this testimony was properly admitted.

There remains the issue of damages. It appears to have been agreed that, assuming that appellant was obligated to harvest the peas at an earlier date, the measure of damages would be the difference between the amount that respondent-growers would have received for them at that time, and the amount which they actually received. In order to prove their damages, respondents introduced Dr. Leonard Carstens, an agricultural expert whose qualifications were duly set forth. He testified that peas gain in weight as they become harder, and thus will increase the yield from a given field. He then took the actual yields received by respondents when their peas were harvested at the higher grades, and determined what the yield would have been had they been harvested at Grade B. From this, employing the price schedule set forth in the contracts, he estimated what the amount of their financial return would have been under these circumstances. As the increase in yield at Grade H did not offset the reduction in price, the return at Grade B, of course, would have been considerably higher.

Appellant argues that Dr. Carstens' estimates were not accurate because they were based, in part, upon studies made by one Dr. Pollard in Utah, purporting to determine the correspondence between increase in maturity and increase in weight of peas. Dr. Pollard himself was produced as a witness, and testified that he did not consider his data reliable when applied to other varieties of peas than those he had studied, grown in areas other than the Utah valley in which he made his experiments. He stated, however,

that the trend would be the same for all varieties and confessed unfamiliarity with conditions in Skagit county. Dr. Carstens, who was familiar with the situation there, testified that Dr. Pollard's studies corresponded with his own observations.

■ It is unnecessary to detail the testimony of these two witnesses further, for, clearly, the situation presented was one in which the jury was presented with a choice between the testimony of two experts. Undoubtedly, the testimony of Dr. Pollard was entitled to great weight, but the jury was not obliged to select it in favor of Dr. Carstens' testimony, particularly as it appeared that, in using Dr. Pollard's studies, Dr. Carstens was employing the most relevant data available. Probably, it would have been impossible to determine exactly what the peas would have weighed had they been harvested at any given previous time; but, in estimating damages in a case such as this, the precise amount of damage need not be shown where the circumstances do not permit of such careful measurement. See *Jones v. Shell Oil Co.*, 164 Wash. 543, 3 P. (2d) 141; McCormick on Damages, p. 103, ch. 21, § 27. Dr. Carstens' estimates appear to have been the result of careful study and as accurate as it was possible for them to be.

■ But the jury, in awarding its verdicts, did not follow these estimates exactly, and appellant argues that this indicates that conjecture and speculation played more than a permissible part in its decisions. In the case of respondents Wallace Bros., Vogler, and Wear, the jury awarded damages in a sum less than Dr. Carstens had determined they would have been entitled to had the peas been harvested at an average grade of B. Suffice it to say as to these, that the verdicts were well within the proof. The jury could have awarded the full sum established by Dr. Carstens, and the award would have been justified by the evidence. In such a situation, appellant has no cause to complain because the jury selected a lesser amount. *Lagomarsino v. Pacific Alaska Nav. Co.*, 100 Wash. 105, 170 Pac. 368; *O'Connor v. Tesdale*, 34 Wn. (2d) 259, 209 P. (2d) 274.

Respondent Monte Schroeder, however, who originally claimed $2,439.36, was awarded $1,939.56, although, according to Dr. Carstens' estimates, he was entitled to only $1,757.86; and respondent Marston Ball, who had originally claimed $1,416.32, was awarded $1,292.41, although, according to Dr. Carstens' estimates, he was entitled to only $1,053.64.

Respondents did not contend that they were entitled to a sum greater than the amount the peas would have brought in if harvested at a grade of B, and the only evidence they presented to show what this sum would have been was the testimony of Dr. Carstens. Therefore, it would seem that, unless there were special circumstances changing the situation, their recovery should have been limited to the amounts specified by Dr. Carstens. In Schroeder's case, the testimony showed that seven acres of his peas were almost a total loss, having hardened even beyond Grade H at the time they were harvested. There was no claim made in Schroeder's complaint for compensation for peas that were totally lost, and this item was not reflected in Dr. Carstens' computations. The evidence concerning the fact of the loss came in without objection, but, when, in his closing argument, counsel for respondents suggested to the jury that this damage was in addition to the damage as specified by Dr. Carstens, and attempted to estimate the amount thereof in monetary terms, appellant's counsel objected that such a claim was beyond the issues in the case. Under the circumstances, this objection would seem to have been well-founded.

In Ball's case, it appeared that the peas had become so hard when they were harvested that they all graded H, and there was some suggestion in the testimony that, when peas become harder, many of them will not thresh and are wasted. Respondents contend that this justifies the excess of $238.77 over Dr. Carstens' estimate, which was awarded by the jury to Ball. But not only was there no claim made in Ball's complaint for peas wasted in this fashion, no evidence whatever was introduced to show what percentage of peas would be lost as the peas reached G and H in grade, and, of course, there was no evidence presented to indicate

what this would mean in terms of financial loss. In point of fact, it was not Ball, but one of the other respondents, Wallace, who mentioned that, at a time when his peas were running mostly in Grade F, he "noticed a lot of hard ones unthreshed." Clearly, damages suffered from this alleged loss were "not proved with reasonable certainty." *Cuschner v. Pittsburgh-Hickson Co.*, 91 Wash. 371, 157 Pac. 879.

■ Except for these items which the jury had no right to consider, the situation in which Schroeder and Ball were placed was not substantially different from that of the other plaintiffs, and there appears to be no justification in the evidence for awarding them a greater amount than that which Dr. Carstens stated would have accrued to them had their peas actually been harvested at Grade B. For this reason, the recoveries in the Schroeder and Ball cases will be reduced to $1,757.86 and $1,053.64, respectively. See *Alexander v. Al G. Barnes Amusement Co.*, 105 Wash. 346, 177 Pac. 786.

The judgments in the *Schroeder* and *Ball* cases are affirmed as modified; the judgments in the other cases are affirmed in their entirety. All of the respondents will recover their costs in this court.

SIMPSON, C. J., MALLERY, HILL, and HAMLEY, JJ., concur.