Argued October 10; affirmed November 26, 1935

## NUNNER ET AL. *v.* ERICKSON ET AL.

(51 P. (2) 839)

*W. O. Sims,* of Portland (Sims, Weinke & Amstutz, of Portland, on the brief), for appellants.

*Verne Dusenbery,* of Portland (Crum & Dusenbery, of Portland, on the brief), for respondent Federal Land Bank.

*Estes Snedecor,* of Portland, for respondents Erickson heirs and Erickson's Dairy Products Co.

*George G. Van Natta,* of St. Helens, for respondent Columbia County National Farm Loan Ass'n.

ROSSMAN, J. Joseph and Cora Erickson, husband and wife, now deceased, were the parents of nine children, six of whom are plaintiffs in this suit, and three of whom are defendants. One of the six died while this suit was pending, and the administratrix of her estate was substituted as a party-plaintiff. The seventh party-plaintiff is the administratrix of Cora Erickson's estate. The three sons of Joseph and Cora Erickson, who are the defendants in this suit, are the youngest of the children. The other parties-defendant are four corporations: Erickson's Dairy Products Company, The Columbia Finance Company, Columbia County National Farm Loan Association, and the Federal Land Bank of Spokane. For the sake of facility of expression, we shall refer to the six children who instituted this suit as the plaintiffs, and to the three sons as the defendants.

Joseph Erickson, the father, was born in Finland and was possessed of such a meager schooling that he was compelled to employ an x for his signature. One of his daughters, who is a plaintiff in this suit, described him, however, as a good business man. Cora Erickson, the mother, was born in Norway, came to the United States when she was seven years old and acquired more schooling than her husband had gained. She wrote her husband's checks and kept his accounts, etc. May 27, 1927, at the age of 73, the father died intestate. His son Walter was appointed administrator of the estate. December 27, 1929, when the mother was 65 years old, she died intestate, and her daughter Alice was appointed administratrix of her estate. The eldest of the nine children is now 53 years of age and the youngest is 32.

Apparently the first home that the family acquired was a farm in the lower Columbia River valley, to which the children referred as the homestead. Here the father labored hard, grubbing the stumps and tilling the available soil. In his labors he was assisted by such of the children as were able to lend a hand. After the homestead had been acquired the father devoted part of his time to employment as a logger. Later, when his eldest son Joseph had reached maturity, the father and he became partners in a logging business. After being in this venture for about six years the business was sold for $60,000, out of which there was returned to the father the capital which he had advanced, and the balance was divided between him and Joseph, yielding to each approximately $26,000 profit. About this time the father advanced sufficient capital to his second son Oscar to enable him to acquire a mercantile business. Since the business failed to earn its operating expenses, the father was compelled to make further advances from time to time. Finally, the store was liquidated. The father helped one of his daughters to acquire a home and also extended financial assistance to others of the plaintiffs.

About 1909, after the father had retired from the logging business, he purchased a tract of land of about 230 acres located four or five miles from St. Helens upon which the family established its home. This property is the subject matter of this controversy. The land was raw and those of the children who were still living at home assisted the father in clearing it and bringing it into cultivation. By 1918 all of the children, except the three youngest, had left the farm. Of the three youngest, Irving was attending high school, Walter was a student at Oregon State College, and Charles, the eldest of the three, had recently taken employment in

Portland. In that year the father called Charles, then about 21 years of age, back to the farm to assist in its operation, promising him that for his efforts he would receive one-half of the net profits. May 2, 1922, the father, in order to encourage Charles, gave him a bill of sale to one-half of the livestock upon the place. In order to promote the enterprise Charles spent $1,200 of his own money in improving the property. About this time the father offered to sell Charles one-half of the farm for $10,000. By the early part of 1926 Walter had completed his course of study at Oregon State College and was working at Rainier, a few miles distant from the farm. Irving was still a student, but was working on the farm during vacation periods.

In the latter part of 1925, according to the uncontradicted testimony of the three defendants, the parents, without any solicitation whatever, proposed to convey the farm and all of its equipment to these defendants for a consideration of $24,000, provided the boys would give a note for that amount secured by a mortgage upon the place. According to Charles, $40,000 "was pretty close" to the value of the farm. Charles, the only witness upon the subject, swore that the parents were uncertain as to the manner in which they desired the boys' obligation to be expressed until they had conferred with their attorney. Charles accompanied his parents to the attorney's office. Here the mother suggested two notes so that one-half of the purchase price would be payable to her, declaring "she wanted it (her half) cancelled after death". The father, however, did not want his half to be cancelled upon his death, stating "he wanted all the children to get part of it". According to Charles, the attorney recommended that a single note be employed and then the parents could do with their respective parts what-

ever each preferred. His recommendation was followed. A deed for the land, a bill of sale for the livestock, a note and a mortgage were prepared. The deed expressed a consideration of $30,000. However, the uncontradicted testimony shows that the consideration was $24,000. The note reads as follows:

"For value received, I promise to pay to Joseph Erickson and Cora Erickson Twenty-Four Thousand Dollars, in Gold Coin of the United States of America, without interest, payable in monthly installments of not less than $50.00 nor more than $200.00 per month at the option of the payees herein, during their lifetime, and upon their death the balance due and unpaid to be paid to their heirs in monthly installments of $100.00 per month; all monthly payments hereinbefore provided for to be paid on the first of each month hereafter until the whole principal sum hereinbefore named shall have been paid; if any of said installments are not so paid, the full amount hereof shall become immediately due and collectible at the option of the payees. In case suit or action is instituted to collect this note or any portion thereof, I promise to pay such additional sum as the Court may adjudge reasonable as attorney's fees in said suit or action."

The mortgage was of the usual character and provided:

"* * * have bargained, sold and conveyed, and by these presents do bargain, sell and convey unto Joseph Erickson and Cora Erickson, parties of the second part, and to their heirs, the following described premises * * * but in case default shall be made in payment of the principal or any or either of the installments as therein provided, then the said Joseph Erickson and Cora Erickson or their heirs as the case may be, may sell the premises above described, with all and every of the appurtenances, or any part thereof in the manner prescribed by law * * * and the overplus, if any there be, pay over to the said Charles D. Erickson, Walter S. Erickson and Irving T. Erickson,

their heirs or assigns; and the said parties of the first part, for their heirs, executors and administrators do covenant and agree to pay the said parties of the second part, or their heirs, the said sum of money as above mentioned.''

The deed, note, mortgage and bill of sale were executed January 2, 1926.

With the conclusion of the transactions just mentioned, the three defendants went into possession of the dairy farm as owners. Their parents, however, continued to make their home upon the property until death, and the boys maintained the payments required by their parents. At the time of the father's death, May 27, 1927, defendants had paid upon the note a total of $1,833.81, leaving a balance due of $22,166.19. They spent other sums of substantial size in making improvements upon the place. May 14, 1926, the three defendants sold a fifteen-acre portion of the farm, and at that time their parents executed a release of the mortgage upon the tract sold.

After the defendants became owners of the farm they became engaged in the manufacture of ice cream, and, finding this to be a profitable means of disposing of their milk and cream, laid plans for the construction of a larger plant in the city of St. Helens. In order to carry out their program, they needed about $20,000. January 19, 1928, they applied to the Federal Land Bank of Spokane, which is one of the defendants in this suit, for a federal farm loan of $20,000 on the dairy farm, stating that they intended to use the money to pay off the $24,000 note and mortgage held by Cora Erickson and the estate of Joseph Erickson, deceased. Their application was approved in April, 1928, and the loan was made after the defendants had signed a note for $20,000, payable to the bank and secured by a

mortgage upon the farm. Prior to the delivery of the note and mortgage to the bank, Walter Erickson wrote across the face of the $24,000 note the following: ''Paid in full April 21, 1928.'' As administrator of his deceased father's estate, he signed this acknowledgment of payment, as did also his mother. They also executed a satisfaction of the mortgage which was promptly recorded in the mortgage records of Columbia county. The money advanced by the bank was paid to Walter in the mother's presence, and was not employed for the satisfaction of the $24,000 note, but was used for the purchase of a building site in St. Helens and in the construction of the creamery plant. The building and equipment cost $19,926.41.

The cancellation of the $24,000 note and mortgage without being accompanied by payment of the cash received from the federal bank is the subject matter of attack in this suit. The plaintiffs insist that the words ''their heirs'' found in the $24,000 note are words of purchase and not of limitation, and, based upon that construction, argue that the note and mortgage create a trust of which they are six of the beneficiaries. They submit that if the note and mortgage is not construed in that manner it should be construed as a contract made, in part, for their benefit. Based further upon their contention that the note made all sums remaining unpaid upon the death of the father and mother payable to the children as ''their heirs'', they contend that Walter, as administrator, had no authority to cancel the note, especially not without paying the proceeds of the federal bank loan to them. We add that they contend that the federal bank rendered itself liable to the plaintiffs in the sum of $20,000 when it failed to see to it that an appropriate part of the $20,000 actually reached the plaintiffs.

Before the $24,000 mortgage was cancelled the three boys had agreed with their mother that they would give her a note for one-half of the unpaid sum to be secured by a mortgage upon the creamery property. No note was actually given to her until July 19, 1928. The delay is not criticized. The note then given was for $12,000— one-half of $24,000—because the $24,000 note contain-' ing a memorandum of the sums paid upon it could not be found. The following is quoted from this $12,000 note:

"* * * I promise to pay to Cora Erickson Twelve Thousand Dollars, in Gold Coin of the United States of America, without interest, payable in monthly installments of not more than One Hundred Dollars per month, or any unpaid accumulated amounts thereof at such times as payee may elect, during her life time and upon her death the balance due and unpaid to be paid to her heirs in monthly installments of One Hundred Dollars per month; * * *"

Concurrently with the signing of this note, the defendants executed a mortgage securing its payment which described the creamery plant. The mortgage was recorded and both it and the note were delivered to the mother.

In February, 1929, the three defendants caused to be incorporated the Erickson's Dairy Products Company, which is one of the defendants in this suit, and conveyed to it the dairy farm and the St. Helens property. Apparently they owned nothing else except their household furniture. The three defendants were and are the sole stockholders of that corporation. February 14, 1929, the corporation executed a note in the sum of $10,331.23, payable to Walter S. Erickson, administrator of the estate of Joseph Erickson, deceased, or order, in monthly installments of not less than $50. It provided for the payment of interest

only upon sums in default. To secure payment of this note, the corporation executed a second mortgage upon the dairy farm. If one-half of the $24,000 obligation descended to Joseph Erickson's estate upon his death, then, according to the record, $10,331.23 was the sum unpaid upon that half obligation when this new note and mortgage were executed.

May 27, 1931, the defendants caused another mortgage to be prepared and executed. Walter, as we have stated, had been appointed administrator of his deceased father's estate, and was now anxious to complete the duties of his office. By that time the $10,-331.23 obligation had been reduced to $9,180 by payments made by the three defendants since February 14, 1929. In order to render possible distribution of an appropriate part of the unpaid $9,180 to each of the nine children and to the deceased mother's estate, the corporation signed eighteen notes, each in the sum of $510, and secured their payment by a second mortgage upon the dairy farm. Walter thereupon delivered one of these notes to each of the children, and nine to the estate of Cora Erickson, deceased. The $10,331.23 mortgage was then cancelled. The payee of these notes was Walter Erickson, administrator, and the mortgagee was the Columbia Finance Company, one of the defendants in this suit, as trustee. The notes were payable in annual installments of not less than $24. The six plaintiff heirs, as well as the administratrix of the mother's estate, returned the notes.

By way of summary, we set forth the following:

January 2, 1926, $24,000 note and mortgage executed and delivered;

May 27, 1927, the father died;

August 3, 1927, Walter appointed administrator;

April 2, 1928, $20,000 note given to federal bank;

April 21, 1928, $24,000 note and mortgage cancelled;

July 19, 1928, $12,000 note given to the mother;

February 14, 1929, $10,331.23 corporation note given to Walter, as administrator;

December 27, 1929, the mother died;

October 25, 1930, Walter, as administrator, filed inventory in Joseph Erickson estate;

May 27, 1931, eighteen $510 corporation notes, secured by a mortgage denominating the Columbia Finance Company, mortgagee, executed.

We now return for a moment to the beginning of this entire transaction, and, after taking note briefly of what then occurred, shall review the incidents accompanying the execution of each of the notes and mortgages. There is no contention that the defendants imposed upon their parents when the latt r sold to them the farm at a price of $24,000, all of which was evidenced by the $24,000 note secured by the mortgage already mentioned. Evidently the parents wanted to favor their three youngest sons and proposed this transaction upon their own volition. So far as the record discloses, the parents never voiced any dissatisfaction whatever with what they had done. Apparently they wanted the dairy farm to be well operated and felt that these defendants would so operate it.

Only four of the six complaining heirs testified. It affirmatively appears that these four were familiar with the fact that their parents had sold the farm to the defendants, and that the latter were indebted to their parents on that account. We quote from the testimony of one of them:

"Q. Now, as a matter of fact, your father or mother,—had they ever told you that there was a sale of the farm and that they had taken the $24,000.00 mortgage? A. Yes, my father had told me that.

"Q. About when did he mention that to you? A. In 1926, I believe." She added: "He said matters had been arranged so that what was left when he passed on would be divided equally among his children." We quote further from her testimony the following: "I knew there was a $24,000 note and mortgage because my father told me there was." From the testimony of another of the complaining heirs, we quote:

"Q. Do you know about when that farm was sold by them to your three younger brothers? A. Oh, I do know. As far as fixing dates, I guess it would be a bit of a guess, but I think it is '26.

"Q. At the time the transaction was had were you advised by either the purchasers or by your parents the terms of the transaction? A. Shortly after I was up to the farm on a Sunday and Charley told me that they had bought the place, giving the folks a $24,000.00 mortgage and that we really paid $30,000.00, but the folks figured that they owed us some, so they would make the note $24,000.00 for the mortgage.   *   *   *".

Still another of the plaintiff heirs testified: "I knew of the $24,000 mortgage," adding that her father told her about it in September, 1926. The fourth one of the complaining heirs testified that she had worked upon the farm for the defendants after they had acquired ownership. From this circumstance we assume that she must have known that the defendants, and not the parents, were the owners of the place.

We now pass on to the circumstances attendant upon the cancellation of the $24,000 obligation and the substitution in its stead of the other securities. According to the uncontradicted testimony of the defendants, the mother was acquainted with their purposes before the $24,000 note and mortgage were cancelled to make way for the $20,000 federal bank loan, and

gave her consent. Next, according to the same testimony, the defendant Charles Erickson talked with three of the plaintiffs—Oscar Erickson, Bertha Monteith and Alice Nunner—four months before the note and mortgage were cancelled concerning a new loan. The plaintiff Alice Nunner, referring to the conference which Charles had with her concerning his plans, said: "I can't tell you the exact words that took place, but he was sort of feeling us out to see what our attitude might be." She admitted that Charles said that he and his brothers would like to obtain "a Federal Bank loan". Oscar gave his version of the conference with Charles, thus: "That was the latter part of December, 1927; he told me that they were wanting to build an ice cream plant, and they thought perhaps they could arrange for a federal loan on the farm if we would consent to letting them use part of the farm as security. His suggestion was that the place be divided and I suggested that we might take a second mortgage. Mrs. Monteith was also present and she didn't take very kindly to that suggestion. Anyway, we let them know we would be willing to cooperate with him when he got his plans further, more definitely arranged." The conference was held in the home of the plaintiff Bertha Monteith who gave her recollection of what was said in the following: "Charles said that he would like to talk over the matter with us, that it seemed desirable for them to obtain a loan in order to build a creamery and wondered if something might be done whereby they might obtain this loan; and I believe we said that,—I said, and I think Oscar did also, that we would like to help them. I know that so far as I myself was concerned I didn't favor a second mortgage." She added that she suggested that the heirs might take a mortgage

on a part of the dairy farm, releasing the balance to provide security for the building loan. According to the testimony, the amount of the proposed mortgage was not mentioned and no agreement was reached. Charles gave his version of the conference as follows: "I don't exactly remember the words of what went on, but I told them of our wishes and, as far as I can remember, there wasn't any objections except it seems to me Bertha said something against it but she later said that, well, she would kind of like to do what the rest of them—didn't want to hold us back, but that is about all." He added that a discussion occurred about dividing the farm so that the $24,000 could be secured by a portion of the farm and the balance be used as security for the proposed new loan, but that "they seemed to think a second mortgage would be better than the first." He swore that he told the three with whom he talked that the "mother's half of the mortgage would be secured by a first mortgage on the creamery building." Charles testified that he discussed the matter no further with his brothers and sisters, but next conferred with his attorney, Mr. Glen Metsker. He swore: "Metsker said, 'What does your mother say about it?' Well, all agreeable with her; he said, 'Well, has anybody objected?' and we said no; and we asked him about getting the papers and he said, 'Isn't Walter administrator?' And we let it go at that, just with the understanding that he had authority and we hadn't made any objection." According to him, Mr. Metsker advised the defendants that the mother and Walter, as administrator, had authority to cancel the existing note and mortgage. Thereupon the $24,000 note and mortgage were cancelled and the loan from the federal bank previously described was obtained. Construction work was at once undertaken upon the creamery building,

and, according to the uncontradicted testimony, some of the plaintiffs viewed the construction activities.

Although Walter was appointed administrator of his deceased father's estate August 3, 1927, he did not file an inventory until October 25, 1930. The only reference in the latter instrument to the obligations arising out of the $24,000 note and mortgage is the following:

"A debt of $11,083.09 against Charles D. Erickson, Walter S. Erickson and Irving T. Erickson as of May 27, 1927, which is payable at the rate of $50.00 per month and no more, and bears no interest except when debtors are in default (now secured by a mortgage made since the decease of said Joseph Erickson) which is appraised at $6,000.00."

Before that inventory was filed the $24,000 note and mortgage had been cancelled (April 21, 1928) and the note of $12,000, signed by the three defendants July 19, 1928, payable to the mother, and the note for $10,331.23, signed by the corporation February 14, 1929, payable to Walter, as administrator, had both been executed.

To avoid misunderstanding, we add that no note and mortgage in the denomination of $11,083.09 were ever prepared or contemplated. When the inventory was signed the defendants believed that one-half of their debt upon the $24,000 obligation was due to their father's estate, and that the sum unpaid at the time of his death was $11,083.09; hence, Walter inserted that figure in his inventory. The defendants did not execute a new note and a new mortgage in behalf of the estate of their deceased father concurrently with the cancellation of the $24,000 obligation. About ten months passed before the $10,331.23 note and mortgage were signed. By that time payments made upon the obligation had reduced the $11,083.09 sum to $10,331.23. Walter explained the delay, thus: "We were all pretty busy and

we didn't know just exactly what this amount should have been made out for and it was left to later on, and at the time we incorporated, why then we made this mortgage out.''

Let us now undertake to determine when the plaintiffs first learned of the cancellation of the $24,000 obligation and the substitution in its stead of the other securities. The plaintiff Alice Nunner testified that her brother Walter delivered to her the $12,000 note, payable to the mother, in the latter part of January or the early part of February, 1930. She was appointed administratrix February 24, 1930. She testified that shortly after her appointment Walter showed her entries in his account books of the payments which the defendants had made upon the note prior to the mother's death, and that she made a memorandum of these payments. She stated that on February 14, 1931, she met with the defendants in the office of George Van Natta, the attorney who was probating the father's estate. Her attorney, T. A. Weinke, accompanied her. The payments made upon the $24,000 obligation were there discussed, as well as the payments made upon the $12,000 note. In the course of this conference, according to Mrs. Nunner, the defendants requested that the payments upon the $12,000 note be reduced from $100 per month to $50, stating that the $24,000 note which had been, in part, superseded by the $12,000 note reduced the amount payable after the death of the original payees, and to substantiate their contention, showed her the $24,000 note. Thus, it is evident from her testimony that by February 14, 1931, she had seen these two notes and had been informed that the smaller one was, in part, a substitution for the larger one.

Mr. Weinke testified that he was in Mr. Van Natta's office upon the above-mentioned occasion and while he was not certain, he believed that the $24,000 note was then shown to him. He recalled that at that time he knew of an earlier obligation, stating: "It seems to me that I did know there was another mortgage at that time, * * * but I hadn't seen the mortgage or what property it covered."

Walter apparently recalled more of the details of these conferences. According to him, his sister, upon the first of these visits, asked him to help locate the $12,000 note and mortgage. Finally they found them in the mother's trunk. He swore that Alice took them with her when she departed. He testified that he examined the instruments himself at that time, and then told his sister that evidently an error had crept into the $12,000 note because it did not reduce the amount of the monthly installments in harmony with the $24,000 mortgage which it had, in part, superseded. He further swore that his sister thereupon stated that when the $24,000 mortgage was found the correction could be made if it substantiated his contention. Referring to the second visit from his sister, he testified that at that time he showed her the defendants' Mortgage Payable account, and told her that upon the death of the father the $24,000 obligation had been divided into halves, one for the mother and the other for the deceased father's estate. This meeting, he said, occurred in the spring of 1930 and was followed by the meeting in Mr. Van Natta's office on February 14, 1931.

We now come to a meeting which all agreed occurred April 18, 1931, at the home of Ida Lovegren, the daughter who died after the institution of this suit. All children, with the exception of the defendant Irving, were present. Prior to this meeting the plaintiff

Alice Nunner had filed an inventory and appraisement of the Cora Erickson estate, and had sent a copy of it to each of the children. From it we quote:

"One note for $12,000 on which was paid at the time of death of deceased $1,055.23. This note is secured by a real estate mortgage. Note bears no interest ............................................$5,000.00
"An undivided ½ interest in the estate of Joseph Erickson, deceased, appraised at $3,000.00 ................................................................. 3,000.00"

Mrs. Nunner testified that by the time this meeting was held she knew that the $24,000 mortgage had been satisfied, that her mother had taken a $12,000 note secured by a mortgage on the creamery property, and that another note amounting to something more than $10,000, secured by a second mortgage, had been given in lieu of the father's half of the original mortgage. At this meeting Mrs. Nunner's inventory was discussed. In the course of the meeting the defendants asked that the monthly payments upon the $12,000 note be reduced, in harmony with the schedule of payments of the $24,000 mortgage. All of those who testified stated that this request was disfavored because the defendants had substituted the security behind the original note. Oscar Erickson, in telling about this meeting, testified: "I didn't feel that such changes should have been made without taking us into consideration, getting our consent, and I felt that our securities had been greatly impaired by the change, substituting a second mortgage for a first mortgage." Bertha Monteith testified that while nothing was said at this meeting about the federal bank loan, nevertheless, the fact that the Joseph Erickson estate had a second mortgage on the farm was several times mentioned. Explaining why she had declined to grant the defendants' request, she

testified: "We felt that our security had been very much devaluated and we didn't wish to accept the changes that he offered.  *  *  *  I recall distinctly that I said that, in view of the fact that a second mortgage had been substituted for the first mortgage that it didn't seem to me that it would be a wise change.  *  *  *  A great deal wasn't said about the mortgages or the replacement of the mortgage, but I do recall that I said, in view of the fact—and I think others said the same thing—in view of the fact that the original mortgage had been replaced, the $24,000 mortgage had been replaced by a second mortgage, that the heirs could not afford to accept the proposition that Walter was making." Anna Olson, another of the plaintiffs, testified that before this meeting she concluded from her sister Alice's inventory that the $24,000 mortgage had been released. Concerning defendants' request for a reduction in the monthly payments, she testified: "I never have believed in second mortgages", but that she was willing to abide by the decision of the others. Walter testified that at this meeting he did not undertake to make an explanation of the changes that had been effected in the securities, explaining, "I guessed they knew about it;  *  *  *  they seemed to; they knew there was a second mortgage and they knew we had built the creamery; they knew all that we knew about it; at least, they didn't ask any questions about it.  *  *  *  Well, I guess they thought they understood it as well as we; we didn't know there was any misunderstanding about it except on this $12,000 note; we were trying to get together on that." He also testified that the plaintiffs, in refusing to grant the defendants' request for a reduction in the amount of the monthly installments, gave as their reason a belief that the defendants had already gained sufficient advantage through the substitution of the mortgages.

According to the testimony, Mrs. Nunner, during the course of the Lovegren meeting, said that, although payments had been made upon these obligations, nothing had been endorsed upon the $12,000 note. The defendants then mentioned the payments which they had made and Mrs. Nunner verified their claims from the memorandum she had made at the time she inspected the defendants' Mortgage Payable account. A further basis of verification was the payment endorsements on the back of the $24,000 note in the handwriting of the mother. All agreed that the defendants were entitled to credit on the $12,000 note, in harmony with their claims, and thereupon Mrs. Nunner made the necessary endorsements.

Those of the plaintiffs who testified claimed that at the time of the Lovegren meeting they had no specific information concerning the note and mortgage given by the defendants to the Joseph Erickson estate. Apparently while the defendants had not been quick to volunteer information, they had always answered all questions truthfully and had made no efforts whatever to conceal anything. As is evident from the situation reviewed above, the plaintiffs had acquired substantial knowledge concerning the securities.

At the Lovegren meeting the plaintiff Alice Nunner, as administratrix of the Cora Erickson estate, stated that, in her capacity as administratrix, she then possessed approximately $1,000, and suggested that it might be well to make a distribution to each of $100. Most of this $1,000, as the plaintiffs knew, had been paid to the administratrix by the defendants in the discharge of the monthly payments upon the Cora Erickson note. All approved Mrs. Nunner's suggestion, and shortly each received $100 from her.

A suggestion was made at the Lovegren meeting that the defendant Walter Erickson hasten the probating of the father's estate. In his efforts to comply with this request, he devised the idea of the eighteen $510 notes, secured by the $9,180 mortgage given to the Columbia Finance Company, as trustee. The $10,331.23 note and mortgage were cancelled and the new instruments were executed May 27, 1931. Walter agreed that he had consulted none of the plaintiffs before making this substitution, but swore that when he delivered the notes he informed each of what he had done. The delivery of the $510 notes was accompanied with each heir's proportionate share of the cash which Walter, as administrator, possessed. As already stated, the plaintiffs returned the $510 notes, but one or two kept the cash.

In August, 1931, Mr. Weinke, the attorney previously mentioned, made an investigation of the mortgage records of Columbia county and thus informed himself of the exact terms and status of the several mortgages above mentioned. At the same time he obtained a copy of the $24,000 mortgage. Mr. Weinke testified that until this time he was unaware of the provisions of that instrument and of the $24,000 note. Mrs. Monteith testified that she had no knowledge of the $20,000 federal bank mortgage until Mrs. Nunner told her about it after Mr. Weinke's investigation. A little later this suit was filed.

The defendants testified that the farm would not have yielded sufficient to provide them with a living and to enable them to discharge the monthly installment payments upon the $24,000 obligation had they not built the creamery. They swore that the creamery enabled them to derive more from their milk and cream than if they had been compelled to dispose of these items

in their unmanufactured state. They also swore that besides owning the farm which was the original security for the debt, their corporation also owned the creamery and about $10,000 worth of property which their parents had never owned. The creamery consisted of the building which housed the equipment employed in the processing of milk and in the manufacture of ice cream, and also of a delivery truck and a large number of frigidaires loaned to customers. They were positive that their ability to discharge the $24,000 obligation was greatly improved by the construction of the St. Helens plant.

The defendants continuously discharged the monthly payments required by the $12,000 note until October, 1931. In that month Mrs. Nunner, as administratrix, refused to accept the tendered payment. From that time the payments were tendered, but not accepted. This suit was filed in September, 1931.

While the above events were transpiring the amount of the defendants' debt was constantly decreasing and the amount of the security was constantly increasing. We justify this statement by the following facts: The $24,000 note exacted payments of $100 per month after the decease of the parents. The substituted notes required payments of $150 per month and the defendants discharged these demands. At the time of the death of the father, May 27, 1927, $11,083.09 was unpaid upon his half of the obligation, if the obligation was divisible. That note and mortgage were not cancelled until April 21, 1928, by which time $550 more had been paid upon the half, leaving $10,553.09 unpaid. Ignoring the mother's rights entirely, and bearing in mind that the defendants constituted one-third of the nine children and were, therefore, entitled to one-third of their deceased father's estate, we find that on April 21, 1928,

the largest sum which the plaintiffs could have received upon this debt was $8,777.58. The mother's death did not occur until twenty months after the note was cancelled and, hence, the sum owing was reduced $1,000 before the plaintiffs asserted a right to receive any of the monthly payments. But for the sake of our calculations, we shall employ the figure $8,777.58. As security for that sum, the farm stood pledged which, however, was already encumbered with a mortgage given to the Federal Land bank. In their application to the latter institution for a mortgage loan, the defendants listed the dwelling house, barn, etc., upon the farm as worth $26,400, and the land as worth $38,300. The sums total $64,740. The plaintiffs have repeatedly pointed to the application as a reliable source of information. Thus, we have $64,740 of value to secure the payment of $20,000 plus $8,777.58. But the $20,000 borrowed from the land bank created at least $20,000 additional value in the defendants' possession, and, hence, they had $87,740 assets with which to discharge $28,777.58 debts, plus the sum owing upon the mother's half.

We come now to the question of whether the defendant Walter Erickson, as administrator of the Joseph Erickson estate, and Cora Erickson, mother of these nine children, as one of the payees of the $24,000 note, possessed authority legally and effectively to cancel that obligation. In view of the plaintiffs' contention that the words "their heirs", occurring in the note just mentioned, are words of purchase and that, therefore, the nine children, as well as the parents, were the payees of the note, it becomes necessary to determine the merits of that contention before considering the authority of an administrator to release a mortgage.

In support of their contention that the words "their heirs" means the parents' nine children, the plaintiffs call attention to the fact that the words "executors and administrators" do not accompany these two words. They argue therefrom that defendants' promise of payment was made directly to all nine children, and that the estates of the deceased parents acquired no interest in the notes. We quote from plaintiffs' brief: "They (the parents) took for life not less than $50 nor more than $200 a month, and unpaid balance to their heirs, without any power or authority of revocation of the contract. The old people wanted to part with their assets to their children   *   *   *.''

The defendants, in support of their contention that the words "their heirs" are words of limitation, argue that the evidence fails to show that the parents intended to make a present gift of any interest in the note to their children, and that the purpose of the portion of the note concerning installment payments after the death of the parents is merely to specify the size of the payments that must then be made.

■ Both parties resort to the Rule in Shelley's Case to obtain a definition of the term "heirs". We shall shortly review the authorities which they cite, but, in the meantime, remind ourselves that not only lawyers but also laymen employ the term "heirs". Webster's New International Dictionary (2d) defines the word "heir" as meaning: "One who inherits, or is entitled to succeed to the possession of any property after the death of its owner." Funk & Wagnalls New Standard Dictionary defines the word thus: "One who on the death of another becomes entitled by operation of law to succeed to the deceased person's estate, as an estate of inheritance." It is a familiar rule of construction

that the courts place upon the words found in an instrument their orthodox meaning, unless some reason exists for departing from that meaning.

■ The Rule in Shelley's Case has been frequently applied by analogy to transfers of personal property: 24 R. C. L., Shelley's Case, p. 907, § 19; *Vogt v. Vogt*, 26 App. D. C. 46. The word "heir", as is stated in 29 C. J., Heir, p. 296, § 13, in its natural signification, is a word of limitation and not of purchase. In *Eckle v. Ryland*, 256 Mo. 424 (165 S. W. 1035), the decision, referring to the term "heirs", states:

"The presumption is it was used as a word of limitation and so it is taken unless the other meaning appears from the intendment of the instrument."

From the carefully prepared decision entitled *Chamberlain v. Runkle*, 28 Ind. App. 599 (63 N. E. 486), we quote:

"The term 'heirs' has a fixed legal meaning as a word of limitation; and a merely presumed intention, even in wills, will not control that significance of the word, and it will not be treated as a word of purchase unless the testator's intent to so use it is manifest."

From *In Re Christy's*, 245 Pa. 529 (91 Atl. 939), we quote:

"The word 'heirs' or 'heirs of the body', are words of limitation of the estate, and not words of purchase. To those words the law attaches a definite meaning. When used by a testator, the law presumes that he used them in their legal sense, that he intended not individuals, but quantity of estate, and descent. Whenever they are employed, therefore, the burden is thrown upon him who contends that they are words of purchase, to rebut that presumption, and to show that they were used in the particular grant or devise to designate persons."

In *Lockwood v. Jesup*, 9 Conn. 272, cited by the plaintiffs, the material parts of the instrument which received the court's attention read as follows:

"May 1, 1822. On demand, for value received, I promise to pay unto the heirs of Jonathan Jesup one hundred dollars, with interest till paid  *   *   *."

The declaration alleged that on May 1, 1822, the plaintiffs were the children and presumptive heirs of Jonathan Jesup, which averment was admitted by demurrer. The defendants' contention, as stated in the decision, was the following: "*   *   *   that this contract is, on the face of it, so utterly void as that it can not be aided by any averments whatever; that there are no promisees to this note; no persons in existence to whom it is made payable." The court, in holding that the plaintiffs were entitled to recover upon the note as the payees under the appellation "the heirs of Jonathan Jesup", affirmed its adherence to the maxim "*quo memo est haeres viventis*", but declared that in many instances the term "heirs" must be construed as "heir apparent" or "presumptive heir" in order to carry out the manifest intent of the user of the term. In *Cox v. Beltzhoover*, 11 Mo. 142 (47 Am. Dec. 145), the material part of the instrument under attack was:

"*   *   *   agree to pay the heirs of Mrs. Elizabeth Cox, by her marriage with William Cox the sum of $775.00, it being the amount due them from Frederick W. Beltzhoover and assumed by me, in part consideration for a   *   *   *."

The complainant's allegation that the plaintiff was the child and presumptive heir of the said Elizabeth Cox by her marriage with William Cox was admitted by demurrer. In holding that the lower court erroneously sustained the demurrer, the supreme court based its decision solely upon *Lockwood v. Jesup, supra*.

It will be observed that in each of these cases the obligation was payable on demand. In each instance it was apparent that a promise of a present benefit was made. Therefore, since it was clearly intended that some one should now be in a position to receive payment, the courts very properly construed "heir" to mean "heir apparent". In *Love v. Francis*, 63 Mich. 181 (29 N. W. 843, 6 Am. St. Rep. 290), also cited by plaintiffs, the instrument provided:

"* * * I promise to pay to the legal heirs of Cyrus K. Francis, four years after his death, sixteen hundred dollars, with seven per cent interest per annum, and payable annually to the said Cyrus K. Francis during his natural lifetime; at his death the interest to cease. The payment of this note is secured by mortgage on real estate * * *."

The maker of the note was the son of Cyrus K. Francis. Payment of interest was defaulted before the father died, and he had instituted a suit to foreclose in the course of which he had placed on record the following statement:

"* * * he was the owner of said real estate above described, and being aged and infirm, he desired to dispose of his said real estate in such a manner as might secure to himself a comfortable support, and at the same time he had it in view to declare and direct the disposition of the avails of his said real estate after his death; * * *"

In holding that by the term "heirs" the father meant his children and grand children living at the time the note was delivered, the court declared:

"Cyrus K. Francis, in his lifetime, being the owner of 49 acres of land, wished to reserve to himself the income arising therefrom during his life, and to give the avails thereof to his heirs. One object was to prevent the distribution thereof through the ordinary channel

of the probate court, and to make distribution thereof by his own hand during his life. * * *''

Then the court, referring to the term ''the legal heirs of Cyrus K. Francis'', held:

''* * * He referred, by that expression, to a class of persons then in being, who bore that relation to him which would constitute them legal heirs at his death should it occur at that time. These, under our statute, are the children living at the time of the death of the ancestor, and issue of any deceased child.''

Besides citing *Lockwood v. Jesup,* supra, and *Love v. Francis,* supra, in behalf of their contention that ''their heirs'' means ''their children'', the plaintiffs also cite *Landers Investment Co. v. Brown,* 300 Mo. 348 (254 S. W. 14, 30 A. L. R. 908); *Tweeddale v. Tweeddale,* 116 Wis. 517 (93 N. W. 440, 96 Am. St. Rep. 1003, 61 L. R. A. 509); and *Vogt v. Vogt,* 26 App. D. C. 46.

In the Landers case one Lizzie M. Sittler owned a parcel of real property and granted a lease for a term of 99 years, which contained the following provision concerning the payment of rent:

''* * * paying for the same unto the said Lizzie M. Sittler for and during her natural life, then to said Blanche Sittler for and during her natural life, if she survives her mother, then upon the death of Lizzie M. Sittler and Blanche Sittler to Lizzie M. Sittler's heirs, administrators and assigns, the yearly rental or sum of * * *.''

At the time of the execution of the lease Lizzie Sittler was a widow, and Blanche, her daughter and only child, was unmarried. Later, December 22, 1913, Blanche married. The mother died June 28, 1916, still a widow, and Blanche died December 22, 1916, leaving a husband but no children. At the time of her death

the mother had brothers, sisters and a niece. Blanche's sole heir was her husband. The issue determined was whether the mother's sisters, brothers and niece were entitled to the rent after Blanche's death, or whether Blanche's widower was entitled to it. The decision was in favor of the former group. We quote:

"In view of the circumstances surrounding the parties at the time of the execution of the lease, it is manifest that they anticipated the possible happening of the very events that did happen, namely, the death of Blanche, after the decease of her mother, without issue, but leaving a husband surviving her, and that the provisions of the lease with respect to the payments thereunder were inserted for the purpose of preventing the rents from going to a stranger to the blood upon the happening of such contingencies. It is clear that 'Lizzie M. Sittler's heirs' were used as words of purchase, and not of limitation, and comprehended those persons who, 'upon the death of Lizzie M. Sittler and Blanche Sittler,' would have been the former's heirs had the latter predeceased her.''

It will be observed that the court stated ''it is manifest'' that Mrs. Sittler did not intend a stranger to her blood to receive the rent. In the following language it expressed its principal reason for that conclusion:

"It is contended by appellant that the word 'heirs' in the phrase 'Lizzie M. Sittler's heirs' is to be taken in its usual and ordinary sense as meaning the persons on whom the law casts an estate upon the death of the ancestor. If it were used in that sense, then the provisions of the lease specifically naming the persons to whom the quarter-annual payments should be successively made were wholly superfluous, serving no purpose whatever.''

In *Tweeddale v. Tweeddale,* supra, the facts were: Daniel Tweeddale, for a valuable consideration given to him by his mother, executed a bond for her support,

secured by a real estate mortgage. One of the provisions of the instrument was that if the land pledged as security should be sold, there should be paid to the mother $1,200, to Tweeddale's sister, $50, and to his brother Edward, $100, concurrently with the conveyance. The land was sold, $686 was paid to the mother, and she entered a marginal satisfaction upon the mortgage records. The plaintiff, Edward Tweeddale, to whom there should have been paid $100 at the time of the conveyance, not having received anything, brought the action now under review to foreclose the mortgage. The decision was in no way concerned with the construction of the term "heirs" for that term was not employed in the transaction. The main issue was whether the son possessed any contractual rights which could enable him to attack his mother's act. In holding that privity of conduct existed between the son and the mortgagor, the court declared:

"* * * where one person, for a consideration moving to him from another, promises to pay to a third person a sum of money, the law immediately operates upon the acts of the parties, establishing the essential of privity between the promisor and the third person requisite to binding contractual relations between them, resulting in the immediate establishment of a new relation of debtor and creditor, regardless of the relations of the third person to the immediate promisee in the transaction; that the liability is as binding between the promisor and the third person as it would be if the consideration for the promise moved from the latter to the former and such promisor made the promise directly to such third person, regardless of whether the latter has any knowledge of the transaction at the time of its occurrence; that the liability being once created by the acts of the immediate parties to the transaction and the operation of the law thereon, neither one nor both of such parties can thereafter change the situation as regards the third person without his consent."

In *Vogt v. Vogt,* the testator's will provided that his property should be sold and that the proceeds of the sale should be divided "among my heirs, share and share alike, and paid over to them respectively at once, except the share coming to my son, Fred H. Vogt. Said share shall be paid to Charles Graff and Frederick C. Gieseking, as trustees, by them invested, the income therefrom to be paid said Fred H. Vogt, the principal to be paid to his heirs after his death". The issue determined in the decision was whether the Rule in Shelley's Case gave Vogt the absolute estate in his share, or only the income thereof for life with remainder to his daughter. The decision held that he merely obtained the income for his life. It is prefaced with the observation:

"There can be no doubt that the real intention of the testator as that Fred H. Vogt should take nothing more than a life estate in the designation share,—that is, the income thereof during his life, and that the same should then pass into the possession and enjoyment of his children or next of kin;  *   *   *"

The court, in holding that the Rule in Shelley's Case, upon which Vogt relied, did not give him the absolute estate, first pointed out that the trustees took title during Vogt's life, subject to a duty to transfer the trust res to his heirs upon his death, and then declared:

"The trust being expressly limited to the life estate of Fred H. Vogt, the remainder to the heirs is a legal estate, and hence there can be no union of the two estates under the Rule in Shelley's Case."

Next, the court observed the tendency "to deny the application of the rule 'where the intent of the testator has been made to appear so plainly to the contrary that no one could misunderstand it.' " And, after again stating that it was clearly the intention of the testator

that Fred Vogt should have nothing more than a life income, held that he never acquired the absolute estate.

In *Palmateer et al. v. Reid,* 121 Or. 179 (254 P. 359), this court construed a deed, the habendum clause of which was as follows: "To have and to hold the above described premises unto the said party of the second part and his heirs forever, except that the said parties of the first part hereby reserve the use of forty acres of the above described premises * * * as long as the said parties of the first part shall live, provided, however, that the said party of the second part shall have no power to sell and convey said premises but that at his death it is to descend to his heirs." The granting clause of the deed recited that the grantors had "bargained and sold and by these presents do grant, sell and convey unto the said party of the second part" the described premises. In holding that the deed conveyed the fee, the decision stated:

"The direction that the estate conveyed would, upon the death of the grantee, descend to his heirs is in keeping with the law. If Charles W. Palmateer died intestate, the property would, unquestionably, descend to his heirs. It is argued that 'heirs' was used in the sense of 'children' but with this contention we can not agree. It is presumed that the word was used with its legal signification. The word 'heirs', like all other legal terms, is to be given its legal import—in which sense it designates the persons who would by statute succeed to the real estate in case of intestacy—unless it clearly appears from the context that the grantor used it as meaning 'children'. In legal usage, 'heirs' would include persons other than children. It might be that the grantee would have no children at the time of his death. It is possible that his heirs might consist of a father or mother or brother or sister. We can not say from the deed in its entirety that the grantor used the word 'heirs' in any other way than with its legal im-

port: Neal v. Davis, 53 Or. 423, 99 P. 69, 101 P. 212; Devlin on Real Estate (3 ed.) Vol. 2, p. 1555.''

Summarizing, it will be observed that the layman's dictionaries and the decisions of the courts assign to the word ''heirs'' the same meaning, and that the courts are required to presume that the word was employed in its orthodox sense, unless other language of the instrument indicates an unorthodox use. The authorities also declare that the burden of proving that the term was employed in a special sense rests upon the individual who asks that its usual meaning be ignored.

It will be noticed that substantial distinctions exist between the facts involved in the decisions upon which the plaintiffs rely and those now before us. In *Lockwood v. Jesup,* supra, the need for a construction of the term ''the heirs'' arose out of the defendant's contention that, since a living man has no heirs, the use of that term rendered the note payable to no one. It will be recalled that the instrument was a demand note. That circumstance was a cogent reason for believing that the parties meant ''heir apparent''; that is, one whose identity could now be established. In *Cox v. Beltzhoover,* supra, the situation was similar. In *Love v. Francis,* supra, the court quoted the ancestor's statement that in choosing the language of the note he was undertaking to make a testamentary disposition of the obligation and, based thereon, construed the word ''heirs'' as meaning his children and grandchildren living when the note was given. In *Landers Investment Co. v. Brown,* the court, in holding that the term ''heirs'' was used in a special sense, pointed to the language of the instrument itself and declared that if ''heirs'' meant the persons favored by the statutes of descent and distribution ''the provisions of the lease specifically naming the persons to whom the quarter-

annual payments should be successively made were wholly superfluous". *Tweeddale v. Tweeddale* merely sustained the validity of a contract made for the benefit of a third party. In *Vogt v. Vogt,* supra, the court stated: "There can be no doubt that the real intention of the testator was that Fred H. Vogt should take nothing more than a life estate," and declared that the only problem was whether that clearly manifested intention could be given effect in view of the language of the instrument. In other words, in all of these instances the court found language in the instrument which itself indicated that the testator did not intend that there should be attached to the term "heirs" its orthodox meaning.

It appears to us that the authorities above reviewed apply merely the ordinary rule for the interpretation of language which is well stated in section 618, Williston on Contracts, as follows:

"The common or normal meaning of language will be given to the words of a contract unless the circumstances show that in a particular case a special meaning should be attached to it. Ordinary language may bear locally an extraordinary meaning in some circumstances, but in the vast majority of cases it does not. Technical terms or words of art will be given their technical meaning, unless the context or local usage shows a contrary intention, and under this principle mercantile terms in mercantile contracts will be given the meaning which merchants ordinarily give them. This rule, however, will yield if the application of other primary rules show a contrary meaning. Thus, if the circumstances or context show that a technical word was not used in its proper technical sense, another meaning may be given it. So an ordinary word may from the context (or surrounding circumstances) be given an unusual meaning. The writing will be read as a whole, and every part will be construed with reference to the whole; and if possible it will be so construed

as to give effect to its general purpose. The context and subject-matter of a contract may show that in a particular sentence an ordinary word has an unusual meaning; or that a word whose meaning, taken by itself, is clear, has been inaccurately used. *'Noscitur a Sociis'* is an old maxim which summarizes the rule both of language and of law that the meaning of words may be indicated or controlled by those with which they are associated. The circumstances under which a writing was made may always be shown. The question the court is seeking to answer is the meaning of the writing at the time and place when the contract was made; and all the surrounding circumstances at that time necessarily throw light upon the meaning of the contract. The importance of this rule and the fact that it is sometimes supposed to be applicable only in the case of an ambiguous writing makes necessary some discussion in a subsequent section, as well as some definition of what is meant by surrounding circumstances.''

Section 9-217, Oregon Code 1930, provides:

''The terms of a writing are presumed to have been used in their primary and general acceptation, but * * *,,

If we assign to the term ''their heirs'' its ordinary meaning, the provision for payments after the death of the parents referred to those individuals favored by will or by the statutes of descent and distribution. If we apply the Rule in Shelley's Case by analogy to the situation before us, then, since the note provided the parents with an income for life and directed that the remainder should be paid to ''their heirs'', the heirs took nothing by the instrument itself. The interest which they now possess came to them through inheritance. Neither of these two rules of interpretation treat the words ''their heirs'' as the equivalent of ''their children''. Let us test the reasonableness of such possible interpretations further. If we regard ''their

heirs'' as the equivalent of ''their children'' and believe that the purpose of the parents in using that term was to give the nine children a present interest in the note, then the parents never acquired for themselves full dominion over the note, but shared it with the nine children. The plaintiffs variously describe the alleged arrangement as (a) a contract for the benefit of the children as well as for the parents; (b) a trust for the children; and (c) a testamentary disposition of the note; but in all instances depend upon an interpretation of ''their heirs'' as the equivalent of ''their children'' to bring them to their goal. If the plaintiffs' interpretation is correct, then the children, as well as the parents, owned the note and the latter could not cancel, sell or pledge it without the approval of all the children, including the three defendants. Since a married person is entitled to receive one-half of the property of his or her spouse upon the latter's death when issue also survive, a holding that ''their heirs'' meant ''their children'' would exclude the surviving parent from all parts of the obligation except the payments reserved during life. Thus, in the event that the survivor was forced to foreclose on account of default, his interest in whatever was recovered would be limited to the payments to be made during the remainder of his life. Further, if the parents meant that the portion of the principal remaining unpaid at their death should be paid to their nine children and intended that the latter, as well as themselves, should be deemed payees of the note, it is strange that they did not use the word ''children''. That would have been for them the natural vehicle of expression. Moreover, if they wanted their children to become with them joint payees, it seems strange that they did not insert the children's names in the

note. It will be recalled that only the parents' names appear in the portion of the note commonly reserved for the payee's name. Had they mentioned their children by name it would have been remarkable if they had included the three who are the obligors. If the latter are three of the payees, a foreclosure following a default would present the novelty of payees foreclosing against themselves. It is true, as the plaintiffs suggest, that the words "administrators, executors and assigns" do not accompany the words "their heirs". It is evident, however, that since the note is assignable the absence of the word "assigns" is inconsequential. If the provision regarding payment after death of the parents was inserted, as the defendants suggest, only for the purpose of specifying the size of the payments to be made after the parents' death, then the absence of "executors and administrators" is unimportant. This suggested use of the contested clause appears to be reasonable. If the parents intended, as the plaintiffs allege, to have given them a present interest in the $24,000 obligation, or to have made a testamentary disposition of it in their favor, then it is abundantly evident that the parents never mentioned their purpose to the plaintiffs, for the latter would not have permitted four years and four months to elapse after the father's death, and two years to pass after the mother's death before asserting ownership of the note.

As is evident from the foregoing, if we place upon the term "their heirs" its orthodox meaning or the meaning ascribed to the term by the Rule in Shelley's Case, the plaintiffs acquired no interest in the note during the lifetime of their parents and none thereafter except by inheritance. To establish the meaning for which the plaintiffs contend, they must prove that their parents did not use the term "their heirs"

in its orthodox sense. We do not believe that they have found anything in the note which amounts to proof of sufficient cogency. To the contrary, we believe that the language of the instrument, when fairly construed, names the parents as the sole payees. The contested clause, in our opinion, merely specifies the size of the payments which must be made after the parents' death. Without setting forth further our analysis of the note and of the contentions of the parties, we state our conclusion that the plaintiffs had no interest in the note during the lives of their parents. We have not overlooked the terms of the mortgage, but, in our opinion, nothing contained in that instrument is at variance with the conclusion just expressed.

■ So far we have been proceeding as though there were no aids to the interpretation of the note and mortgage other than the language of the instruments themselves. However, the conduct of the parties previously reviewed is available as an aid to interpretation in the event that their conduct placed a practical construction upon the contested language: *Wood v. Davin,* 122 Or. 74 (257 P. 690); *City Messenger Co. v. Telegraph Co.,* 74 Or. 433 (145 P. 657); Bogert on Trusts and Trustees, § 50, p. 235. The conduct of the parties which possibly indicates whether or not the parents and the children believed that the plaintiffs had any interest in the note may be summarized thus: (1) May 14, 1926, the parents, in order to enable the three defendants to sell a 15-acre portion of the farm, released from the provisions of the mortgage the parcel sold, thus indicating that they regarded themselves as the sole owners of the note and mortgage. (2) Walter Erickson was appointed administrator of his father's estate August 3, 1927; he at once regarded one-half of the $24,000 obligation as property of the

deceased's estate and his inventory, filed October 27, 1930, included a half of the obligation. Long before this suit was filed at least some of the plaintiffs knew of what he had done, but offered no criticism. (3) In April, 1928, Walter, administrator, and the mother cancelled the $24,000 obligation. Although some of the plaintiffs knew of this release long before this suit was filed, they offered no protest. (4) The plaintiff Alice Nunner, after being appointed administratrix of her deceased mother's estate February 24, 1930, was informed that the $12,000 note, payable to the mother, was in part a substitution for the $24,000 obligation, and expressed no disapproval of the substitution, but on the contrary inventoried the $12,000 note as a part of the mother's estate, and included in the inventory a half interest of the Joseph Erickson estate which consisted largely of the substituted note given to Walter as administrator. (5) After the plaintiff Alice Nunner had been appointed administratrix and had been informed of the substitution of securities, she received payments from the defendants upon the $12,000 note until September, 1931, about a month before this suit was filed. One of her receipts reads as follows:

"Received of Erickson Dairy Products Company, St. Helens, Oregon, to apply on mortgage in favor of Cora Erickson Estate—check in the amount of $1,284.19 and Claim in amount $415.81, which is payment in full of $100 per month from January 1, 1930 to May 30, 1931. Alice A. Nunner, Administratrix, Estate of Cora Erickson."

(6) Alice Nunner, as administratrix, after accounting in her official reports for the payments made by the defendants upon the $12,000 note, made a disbursement of $100 to each of the nine children which each received and kept. (7) At the Lovegren meeting

in April, 1931, none of the plaintiffs claimed to be a payee of the $24,000 note although each knew by that time that the Cora Erickson estate inventoried a substituted note as the property of that estate, and that the Joseph Erickson estate had also inventoried a substituted note. (8) At the Lovegren meeting none of the plaintiffs protested the substitution of the notes, but employed the substitution as the basis for their refusal to alter the terms of the $12,000 instrument. (9) At the Lovegren meeting the six plaintiffs agreed with the defendants upon the amount of credits to which the latter were entitled upon the $12,000 note, and thereupon Alice Nunner, administratrix, made the proper endorsements. (10) Two of the plaintiffs applied for the appointment of the plaintiff Alice Nunner, as administratrix of the Cora Erickson estate, and thereafter all acquiesced in her exercise of dominion over the debts owed by the defendants—a circumstance at variance with the plaintiffs' claim that they took by contract and not by inheritance.

We know of no other acts which indicate the construction placed by the parties upon the instruments. We believe that the above summary shows that neither the parents nor the plaintiffs ever considered the latter as possessing any interest in the note. If the plaintiffs at any of the above-mentioned times believed that they were included among the payees of the note, or that the instrument was in the nature of a trust for their benefit, or that its character was testamentary, they would have asserted such claims upon one or more of the above occasions. Apparently no thought of their present contention entered their minds until after their attorney had consulted the mortgage records in August, 1931. Shortly thereafter this suit was filed. His search brought virtually no new facts to light, al-

though it may be that it stimulated interest and caused the plaintiffs to come to a conclusion. Be this as it may, it is nevertheless true that until that time the plaintiffs regarded the note as payable only to their parents. Further, regardless of what occurred in August, 1931, the construction which the parents had placed upon the note as indicated by their conduct remained undisturbed. In view of the practical construction which all placed upon the instrument, we think the conclusion is inescapable that the questioned term ''their heirs'' did not mean ''their children''.

██ We know of nothing in the record which would warrant a conclusion that when the parents accepted this note they planned to make a testamentary disposition of it. At that time they possessed some bank stock and some accounts receivable. The fact that they possessed these items is a circumstance somewhat at variance with the plaintiffs' contention that they were undertaking to dispose of their estate. Indicating that the parents did not believe that they had made a testamentary disposition of this obligation is the testimony of Mrs. Charles W. Hellmer, who had been an intimate friend of the Ericksons for many years. She testified that in the year that Joseph Erickson died the mother, referring to her interest in the $24,000 obligation, told her, ''She was going to give it to the three boys that bought the farm'', adding that ''she was going to make a will''. She wrote no will, but upon the back of the $24,000 note entered payments aggregating $7,500 which the defendants promptly told the plaintiffs had never been paid. Possibly in this way the mother was endeavoring to carry out her purpose of giving her part of the obligation to the defendants. Without reviewing the situation further, we express

our conclusion that the note and mortgage contained nothing of a testamentary character.

The plaintiffs further contend that the note and the mortgage are susceptible of construction as instruments which provided the parents with annuities for life and which constituted them trustees of an express trust in behalf of their children. To establish that contention, it is necessary, according to Bogert on Trusts and Trustees, § 45, that there exist "in the mind of the settlor an intention that he himself or some other person shall be a trustee and the expression of that intent. The intent is commonly referred to as the trust intent. If it exists secretly surely no trust will begin". Proof of a high degree of cogency is essential for the establishment of the plaintiffs' contention: *Allen v. Hendrick,* 104 Or. 202 (206 P. 733); 65 C. J., Trusts, § 21, p. 231. We fail to find in the evidence the needed proof.

We shall now consider the contention that the defendant Walter Erickson, as administrator of the Joseph Erickson estate, exceeded his authority when he joined with his mother in marking paid the $24,000 note and in releasing the mortgage. The plaintiffs impute no fraud to the defendants. After a careful examination of the record, we are of the opinion that the defendants were not prompted by bad faith in any of the transactions reviewed in this decision. We have already mentioned the fact that after the $24,000 note was found after the mother's death, an entry in her handwriting of $7,500 payments upon it was discovered. Had the defendants been prompted by dishonest purposes they would not have disclaimed credit for these payments. Their conduct in that instance is an indication that they were seeking no unfair advantages. We believe that the defendants honestly

thought that the interests of all would be promoted through the construction and operation of the creamery project. Lending support to their belief is the opinion of one of the children that the farm had never shown a profit during the parents' ownership, with the possible exception of the war period when the grain grown upon it sold at a price of $2.10 a bushel. No one claims that the corporation was created as a means of enabling the defendants to escape from personal liability. The defendants freely admit their personal liability and avow ability promptly to discharge all of the accumulated payments which the plaintiffs have refused to receive since the institution of this suit. For the sake of completeness of statement, we add that Walter obtained no court order before releasing the note and mortgage.

Since improper motives are not imputable to the defendants, the sole issue that must be determined is whether an administrator possesses authority to cancel a note and mortgage without receiving cash payment.

The note, of course, was personal property. This state does not recognize joint ownership of personal property: § 63-207, Oregon Code 1930; *Stout v. Van Zante*, 109 Or. 430 (219 P. 804, 220 P. 414). Although the farm was owned by the father and mother as an estate by the entireties, the note taken from the defendants in consideration thereof did not become their property by the entireties because this state recognizes no such ownership of personal property. Upon the death of Joseph Erickson his estate, therefore, became the owner of a one-half interest in the note, and his widow, Cora, became the owner of the other half: *Stout v. Van Zante*, supra.

618

From *Hofer v. Gofner,* 134 Or. 46 (292 P. 1027), we quote:

"From the foregoing, it is apparent that an executor or administrator has the full legal title to choses in action and debts due the deceased, and may, in the absence of fraud or collusion, release, compound and discharge them as fully as if he were the absolute owner, being answerable for improvidence in the exercise of his power."

From *Weider v. Osborn,* 20 Or. 307 (25 P. 715), we quote:

"These authorities emphasize the general power with which an executor or administrator is invested in respect to choses in action, and his authority to sell or dispose of them by indorsement to another, or to a distributee, without an order of the probate court, and that such transfer is valid and passes the title, so as to enable the transferee or distributee to maintain an action thereon, and that the payors or makers of them, in the absence of fraud or collusion between the administrator and the person to whom he transferred them, can not abate the action on the ground of a want of authority to make such transfer."

From these two decisions, it is clear that the defendant Walter Erickson, as administrator of his deceased father's estate, possessed authority to release or compound the estate's interest in the $24,000 obligation; provided that his action was not accompanied with improvidence. A court order was not necessary. In a preceding paragraph we set forth the condition of the obligation owing to the Joseph Erickson estate at the time the $24,000 note was cancelled, and also the condition of the security which Walter procured. At the time Walter filed his final account $9,180 remained unpaid to the Joseph Erickson estate. When we deduct one-third from that sum there remains $6,120 as the amount due to the plaintiffs when the final account

was filed. At the time the circuit court entered its decree the amount of the tendered payments which had accumulated since the institution of this suit aggregated $1,400. Deducting this amount, we have $4,720 owing to the plaintiffs. The circuit court ordered the defendants to make payment of the $1,400 within 60 days, and required the balance to be paid at the rate of two-thirds of $50 per month. The ability of the defendants to make payment of the $1,400 is not questioned; but the receipt of the sum was refused pending this appeal. The circuit court also ordered the defendants to execute a second mortgage upon the creamery property as further security for the $4,720 balance. It also directed that all of the livestock, equipment, etc., possessed by the defendants be included within the security. It cancelled the 18 $510 notes and the mortgage given to secure their payment. Likewise, it ordered that the defendants make payment upon the $12,000 Cora Erickson note directly to the plaintiffs. The decree against the defendants is personal. The farm, creamery, livestock and all equipment is thus encumbered with the Joseph and Cora Erickson debts. Defendants have not appealed and express no dissatisfaction with the action of the court. It will be recalled from the figures reviewed in a preceding paragraph that the farm and the creamery plant have been estimated to be worth approximately $68,000. The defendants' ability to discharge their indebtedness has been greatly improved by the success of their creamery plant. In view of these circumstances, we can not say that Walter Erickson's action was improvident. Since it was not, and since we are satisfied that it was not attended with bad faith, we conclude that his cancellation of the $24,000 note and mortgage was not invalid.

■ The plaintiffs argue that when Walter Erickson cancelled the $24,000 mortgage and then used the farm as security for the $20,000 Federal Bank loan, he violated the rule which prohibits a fiduciary from employing for his personal advantage property entrusted to him in his fiduciary capacity. A fiduciary must never permit self-interest to affect his course of conduct. Plaintiffs claim this as an additional reason for holding invalid the release of the $24,000 debt and also claim that this action subjected the administrator to personal liability. We have carefully considered the decisions cited by the plaintiffs in support of these propositions: *In Re Myers,* 131 N. Y. 409 (30 N. E. 135); *Estate of William Stott,* 52 Cal. 403; *St. Paul Trust Co. v. Kittson,* 62 Minn. 408 (65 N. W. 74); *Eastham v. Landon,* 17 Wash. 48 (48 P. 739). In each of these cases the fiduciary made a profit through misapplication of trust property. He either diverted trust funds from the trust estate into the channels of his own business or, as in the case last cited, released a mortgage belonging to the estate and then used the property for his own advantage. After a painstaking study of the record we find no evidence that Walter Erickson's act, as administrator, in releasing the $24,000 mortgage resulted in any profit to the three defendants, and we do not believe that the record shows that the plaintiffs have suffered or will suffer any loss through this release. It will be recalled that the mother joined in the release. Possibly the defendants could not have obtained the needed loan except through use of the farm as security. There is no evidence whatever upon that subject; but whether they could or could not have obtained such a loan, they did not escape liability to pay the $24,000 debt. They substituted securities, but covered with mortgages everything that they possessed in an ap-

parent endeavor fully to secure the debt which they owed to their mother and to their father's estate. With the borrowed money they improved their ability eventually to discharge the entire debt. A mortgagor with ability to pay is a desirable debtor. Where the criticized act is performed in good faith and promotes the interest of the estate, the rule upon which the plaintiffs rely will not be enforced with its usual strictness. It will be recalled that when these acts took place the three defendants were very young men. A $24,000 debt is a heavy burden for a farmer to discharge. We are unwilling to hold that Walter Erickson was guilty of any breach of his fiduciary duties when the $24,000 note and mortgage were cancelled to make way for the $20,000 loan.

We have carefully considered all other matters argued in the appellants' brief. Matters not expressly mentioned herein have not escaped our attention, but, in view of the foregoing conclusions, we deem it unnecessary to express our views upon those other issues.

It follows from the foregoing that the decree of the circuit court will be affirmed. Cost will be allowed to neither party.

CAMPBELL, C. J., and BEAN, KELLY and BELT, JJ., concur.

RAND and BAILEY, JJ., concur in the result.