# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

RON AMUNDSON and EDEL
AMUNDSON, husband and wife, and
their marital community,

    Appellants/Cross-Respondents,

v.

JAMES ROGER LEMCKE and
DONNARAE LEMCKE, husband and
wife, and their marital community;
KENNETH HARTUNG and JEANETTE
BETH MEANS, husband and wife, and
their marital community; TRAVIS KRANT
and STACY KRANT, husband and wife,
and their marital community,

    Respondents/Cross-Appellants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 77265-1-I consolidated
with No. 77461-1 & No.
77462-0

DIVISION ONE

UNPUBLISHED OPINION

FILED: October 21, 2019

ANDRUS, J. — Ron and Edel Amundson, prospective purchasers of a property situated on Lake Union owned by James and Donnarae Lemcke (Sellers), appeal the dismissal of their claim for specific performance. The Amundsons challenge the validity of a right of first refusal held by Kenneth Hartung, Jeanette Means, and Travis and Staci Krant, who are houseboat owners and moorage tenants on the Sellers' property (Tenants). The Amundsons also contend that the Tenants failed to properly exercise their right of first refusal by offering to purchase the property on terms that did not match the Amundsons' offer.

The Sellers and Tenants cross-appeal the denial of damages to the Sellers and attorney fees and costs to the Tenants under the *lis pendens* statute, RCW 4.28.328.

We conclude that the Tenants' right of first refusal was valid and that the material terms of their offer matched those in the Amundsons' offer. We therefore affirm summary judgment and the dismissal of the Amundsons' complaint. We similarly affirm the denial of the Sellers' claim of damages and the Tenants' claim for attorney fees under the *lis pendens* statute because the Amundsons had substantial justification for filing a *lis pendens* when they initiated this lawsuit.

## FACTS

The Sellers[1] own property situated on Lake Union in Seattle (Property). The Property consists of a cottage and a dock with three moorage spaces, each of which accommodates one floating home. Houseboat owners Travis and Staci Krant have leased moorage space from Donnarae since 2015. Kenneth Hartung and Jeanette Means, fellow houseboat owners, have leased their moorage space since 1974.[2]

Donnarae granted these Tenants a right of first refusal to purchase the Property in the event she chose to sell it. The Krants' right of first refusal is documented in their written lease, dated June 1, 2015:

---

[1] Donnarae inherited the property from her grandmother, and the lease agreements at issue are between Donnarae and the Tenants. Both James and Donnarae, who are collectively referred to as the Sellers, signed the purchase and sale agreements with the Amundsons and the Tenants.

[2] Richard Duke, who had entered into an oral lease agreement for moorage space with Donnarae's grandmother, leased his houseboat and the moorage space to Means and Hartung in 1974. When Duke passed away in 2015, Means and Hartung inherited the home and the moorage space lease.

9. **Right of First Refusal:** For good consideration in hand received, I as Landlord, agree that if I decide to sell the property, all three houseboat owners will have first right of refusal (either individually or collectively) on the property, but NOT the moorage slips separately. The houseboat owners will have 60 days to match any bona-fide offer tendered for the purchase of the property if any such offer should be presented from other than the three houseboat owners.

Hartung and Means did not have a written lease with Donnarae, but Donnarae testified that she orally promised Means and Hartung a right of first refusal. Means and Hartung also testified that they inherited a right of first refusal from Richard Duke, the previous owner of their houseboat.

In 2016, the Sellers listed the Property for sale for $1.8 million. On May 3, 2016, the Amundsons submitted a list-price cash offer, contained on a standard Commercial Brokers Association Purchase and Sale Agreement form. On May 5, 2016, the Sellers submitted a counteroffer by adding a proposed addendum:

Buyer, Ron Amundson, may only assign this contract to an LLC controlled by himself and/or his immediate family members.

Buyer agrees to provide proof of funds sufficient for closing on or before 5:00 PM on May 9, 2016 or this contract is null and void.

. . .

Pursuant to the terms of existing floating home moorage site rental agreements, each of the three moorage site tenants have a 60 day right of first refusal allowing them individually or collectively to match any offer received by Seller. Any purchase and sale agreement secured through this listing shall be subject to and contingent upon the expiration or waiver of the right of first refusal. If any one or more existing floating home moorage site tenants (or entity formed and controlled by them) exercise their right of first refusal and purchase the subject property, then the Selling Office portion of the commission will be waived.

The Amundsons accepted this counteroffer, and the parties executed an agreement that same day (Amundson PSA).

The next day, the Amundsons' real estate broker, Peter Argeres, sent Mark Anderson, the Sellers' listing agent, a copy of the Amundsons' Merrill Lynch account statement, showing a portfolio valued at over $9 million, to satisfy the proof of funds requirement. Anderson acknowledged the Sellers' acceptance of the documentation as adequate to satisfy the contingency.

The Sellers notified the Tenants of the Amundson PSA on May 9, 2016, and informed them that they had 60 days to match the Amundsons' offer. On July 7, 2016, the Tenants' attorney, Phil Miller, notified the Sellers' attorney, Gregory Petrie, of the Tenants' intent to exercise their right of first refusal. The Tenants submitted a proposed agreement on the same standard Commercial Brokers Association form as the Amundson PSA (the Tenants' PSA). The Tenants' offer included the following addendum:

> 1. Buyer may assign this contract to a Washington non-profit corporation to be operated as a cooperative in which the named individuals comprising Buyer collectively own not less than a 50% interest.
>
> 2. Buyer agrees to provide proof of funds sufficient for closing on or before 5 pm on July 14, 2016 or this contract is null and void.
>
> . . .
>
> 5. Form 17 and Form 22-J as attached to the "Amundson PSA" dated May 3 are incorporated herein.

To satisfy their proof of funds requirement, the Tenants submitted numerous bank statements reflecting liquid assets of approximately $1.2 million and a loan approval letter from Sound Community Bank. The bank's

letter noted that the Tenants intended to include a fourth co-borrower, Katence Olson, on the loan. The loan commitment was conditioned on, among other things, an appraisal of the Property.

Anderson, the listing agent, sent an e-mail to Petrie, the Sellers' attorney, questioning the adequacy of the Tenants' documentation:

> I don't think this offer is a valid matching offer. Other buyer [Amundson] offer includes proof of funds for closing on addendum near back of offer. If houseboat owners need financing to close, then it's subject to an appraisal, unless bank provides approval letter which states buyers are approved, have access to funds, and most importantly it does not require an appraisal for closing.

Petrie responded: "I agree that if they intend to rely upon any financing, they must show they have liquid assets to close in the event the bank refuses to loan the money."

On July 14, 2016, Petrie met with the Sellers to discuss the competing agreements. The Sellers chose to accept the Tenants' offer and to terminate the agreement with the Amundsons. Donnarae felt that the Tenants' PSA was materially the same as the Amundson PSA and was a valid exercise of the Tenants' right of first refusal.

Petrie notified Argeres that the Sellers had accepted the Tenants' offer and subsequently provided him with a copy of the Tenants' proof of funds. Argeres challenged the adequacy of the Tenants' documentation:

> My calculations come up to about $1.2 million which is only two thirds of the necessary matching amount. Two thirds is not a matching amount. Therefore, this is not a matching offer per the Purchase and Sale Agreement. So the prospective Buyers "Tenants" did not satisfy providing proof of funds sufficient for closing per our Purchase and Sale agreement dated May 3, 2016. Please remove the Tenant's

- 5 -

First Right to Purchase so my Buyer [Amundson] can proceed to closing.

The Sellers chose to proceed with the sale to the Tenants. Hartung, Means, the Krants, and Olson applied for a loan with Sound Community Bank in late July 2016 and executed loan commitments with the bank in mid-August 2016.

While the Tenants worked to close the transaction, on August 3, 2016, the Amundsons tendered the full purchase price by cashier's check to the closing agent, First American Title Insurance Company, and demanded that it close the transaction pursuant to the terms of the Amundson PSA. But the firm refused to complete the transaction.

On August 11, 2016, the Amundsons filed a complaint against the Sellers and the Tenants, seeking specific performance of the Amundson PSA. They filed a notice of *lis pendens* on the Property at the same time. The *lis pendens* precluded the Sellers from delivering clear title to the Tenants, causing the bank to refuse to close on the Tenants' loan.

After conducting discovery, the Amundsons moved for summary judgment against both the Sellers and the Tenants "to determine who may buy that Lake Union property." The Tenants also moved for summary judgment, claiming that they were rightfully entitled to purchase the Property because their offer was a matching offer.

On July 20, 2017, the trial court granted summary judgment to the Tenants, holding that the two agreements, while not the "mirror image" of one another, "did not materially vary . . . so as to render void the right of first refusal." It concluded that "The [Sellers'] acceptance of [the Tenants'] purchase and sale agreement

rendered the Amundsons' contract null and void." The trial court then dismissed the Amundsons' complaint.

On August 3, 2017, the Tenants and the Sellers signed a "Stipulation and Judgment of Specific Performance," providing for the sale of the Property to the Tenants in the event the Amundsons did not prevail on appeal. The trial court entered this judgment on August 4, 2017.

The Sellers subsequently sought attorney fees under Paragraph 21 of the Amundson PSA and the lost interest on the $1.8 million purchase price under the *lis pendens* statute, RCW 4.28.328. The Tenants also sought an award of attorney fees under the *lis pendens* statute.

The trial court awarded $37,510 in attorney fees and costs to the Sellers. But it denied the Sellers' request for prejudgment interest and the Tenants' request for attorney fees, concluding that under RCW 4.28.328, the Amundsons had substantial justification for filing the *lis pendens* and that neither the Sellers nor the Tenants were entitled to recover under that statute.

The Amundsons appeal the summary judgment dismissal of their claim for specific performance, the order granting attorney fees and costs to the Sellers, and the judgment of specific performance in favor of the Tenants. The Sellers and the Tenants cross-appeal the denial of their request for relief under RCW 4.28.328.

## ANALYSIS

This court reviews a trial court's order on cross motions for summary judgment and related evidentiary rulings de novo. Wilkinson v. Chiwawa Cmtys. Ass'n, 180 Wn.2d 241, 249, 327 P.3d 614 (2014). Summary judgment is

appropriate "if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Id.

### 1. Validity of the Right of First Refusal

The Amundsons first argue that the Tenants did not possess valid rights of first refusal because they did not tender any consideration to Donnarae in exchange for those rights. But as a non-party to the lease agreements between Donnarae and the Tenants, the Amundsons lack standing to challenge the validity of their rights of first refusal. See Old Nat'l Bank of Wash. v. Arneson, 54 Wn. App. 717, 724, 776 P.2d 145 (1989) (prospective purchaser and purported assignee of right of first refusal lacked standing to challenge the validity of a prior conveyance of the right of first refusal from the assignor to an adjacent landowner).

Even if the Amundsons had standing, the Tenants' lease agreements with Donnarae provided legally sufficient consideration to support their right of first refusal. The Amundsons cite no support for the proposition that there must be a payment of *additional* consideration beyond a tenant's promise to perform their obligations under the lease to validate a right of first refusal. Consideration is a bargained-for exchange of promises. Williams Fruit Co. v. Hanover Ins. Co., 3 Wn. App. 276, 281, 474 P.2d 577 (1970); Labriola v. Pollard Grp., Inc., 152 Wn.2d 828, 833, 100 P.3d 791 (2004). A promise for a promise is sufficient consideration. Omni Group, Inc. v. Seattle-First Nat'l Bank, 32 Wn. App. 22, 24, 645 P.2d 727 (1982). "It is the accepted rule of law in this jurisdiction that a lessee's option to purchase contained in a lease agreement, is grounded upon consideration, and is enforcible [sic] by specific performance." Time Oil Co. v. Palmer, 28 Wn.2d 272,

274, 182 P.2d 695 (1947). Here, the Krants' lease explicitly provided that they had provided "good consideration" for the right of first refusal. At the time this right was conveyed, the Krants agreed to pay rent, to keep the premises in clean and sanitary condition, to properly dispose of all garbage, to maintain their houseboat so as not to jeopardize neighboring houseboats or the dock, not to damage the moorage dock, and not to cause any nuisance or waste. There is no indication that the Krants ever failed to fulfill these promises.

Hartung and Means similarly fulfilled their obligation to pay rent to Donnarae. There is no evidence that Hartung and Means ever breached any term of their oral lease with Donnarae. And Donnarae certainly never claimed that there was no consideration given for the right of first refusal.

The Tenants' promise to comply with the lease terms and their subsequent payment of rent thereunder is legally sufficient consideration to support a right of first refusal. The Tenants' respective rights of first refusal were valid.

2. Matching Agreement Terms

The Amundsons next argue that the Tenants' PSA did not match the Amundson PSA. First, the Amundsons contend the Sellers modified the Tenants' "proof of funds" requirement by accepting a conditional loan pre-approval letter from their lender while insisting that the Amundsons prove they had $1.8 million in immediately available liquid assets. Second, the Amundsons argue that the assignment clause in the Tenants' PSA differed materially from the assignment provision in the Amundson PSA. They contend that because the terms did not

match in these two respects, the Tenants failed to properly exercise their right of first refusal, and the Sellers had no right to terminate the Amundson PSA.

"A right of first refusal . . . is recognized as a valid contract right . . . entitling the owner of the right to the opportunity to buy the subject property on the same terms contained in a bona fide offer from a third party, acceptable to the property owner." Matson v. Emory, 36 Wn. App. 681, 683, 676 P.2d 1029 (1984). In the context of matching offers, "exact identity of offers is not required." Id. at 685. While the terms of the two deals must be the same, only the essential terms need to be identical. Northwest Television Club, Inc. v. Gross Seattle, Inc., 96 Wn.2d 973, 981, 634 P.2d 837 (1981).

a. Proof of Sufficient Funds to Close

Both agreements had identical payment terms, stating that the buyer had to deliver $1.8 million in cash at closing and that there was no financing contingency. The closing date for both agreements was September 2016.[3]

Both agreements also contained identical "proof of funds" provisions. The Amundson PSA provided that: "Buyer agrees to provide proof of funds sufficient for closing on or before 5:00 PM on May 9, 2016 or this contract is null and void." The Tenants' PSA provided that: "Buyer agrees to provide proof of funds sufficient for closing on or before 5 pm on July 14, 2016 or this contract is null and void." Both prospective purchasers had the same number of days to submit

---

[3] The sale to the Amundsons was contingent on a 45-day feasibility period and the removal of the Tenants' 60-day right of first refusal. Closing would have occurred 30 days after the right of first refusal expired. The sale to the Tenants was contingent on a 30-day feasibility period and closing was scheduled to occur 30 days after the expiration of the feasibility period. Thus, under both agreements closing would have occurred in September 2016.

documentation to satisfy the Sellers that they had the financial resources to close the transaction. Based on a review of the four corners of the two agreements, the proof of funds provisions matched.

The Amundsons argue that the proof of funds contingency required the prospective purchasers to show that they had $1.8 million in cash in hand within four days of signing the agreement. The Sellers and the Tenants argue that the proof of funds contingency merely required the Tenants to satisfy the Sellers that they had sources of funding available to generate $1.8 million in cash by the closing date.

When parties dispute the meaning of a contract, the court must ascertain and effectuate their intent at the time they formed the agreement. Matter of Estate of Petelle, 8 Wn. App. 2d 714, 719-20, 440 P.3d 1026 (2019). Washington courts follow the objective manifestation theory of contracts. Pelly v. Panasyuk, 2 Wn. App. 2d 848, 865, 413 P.3d 619 (2018). Under this approach, we attempt to determine intent by focusing on the objective manifestations of the agreement, rather than on the subjective intent of the parties. Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 503, 115 P.3d 262 (2005). We impute an intention corresponding to the reasonable meaning of the words used and generally give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent. Pelly, 2 Wn. App. 2d at 865.

In Berg v. Hudesman, 115 Wn.2d 657, 667, 801 P.2d 222 (1990), our Supreme Court adopted the "context rule" for interpreting contracts. This rule

recognizes that the intent of the parties cannot be interpreted without examining the context surrounding the making of the contract. Id. Extrinsic evidence is admissible to ascertain the parties' intent. Pelly, 2 Wn. App.2d at 866. The court may consider extrinsic evidence concerning the subject matter and objective of the contract, the circumstances surrounding the making of the contract, the subsequent conduct of the parties to the contract, the reasonableness of the parties' respective interpretations, statements made by the parties in preliminary negotiations, usages of trade, and any course of dealing between the parties. Berg at 666-68.

If the agreement has only one reasonable meaning when viewed in this context, that meaning necessarily reflects the parties' intent. Petelle, 8 Wn. App. 2d at 720. If the agreement has more than one reasonable meaning, a question of fact exists. Id. When no material facts are in dispute, contract interpretation is a question of law that we review de novo. Burnett v. Pagliacci Pizza, Inc., 9 Wn. App. 2d 192, 199-200, 442 P.3d 1267 (2019).

First, Petrie, the Sellers' attorney, testified that proof of funds provisions in purchase and sale transactions are a common method of providing a seller a level of comfort that the buyer will be able to financially conclude the transaction. Ron Amundson testified that he understood that "[t]he Seller Defendants wanted to sell to a financially strong buyer who had cash available to close . . ." Amundson's understanding of the agreement is consistent with Petrie's testimony that the Sellers wanted a cash sale and wanted to be satisfied that any buyer had the resources needed to actually close the sale.

Second, the contract language does not specify how the prospective purchasers were expected to prove their financial resources. Petrie stated that nothing in the Amundson PSA, or in general practice, required that this proof of funds consist entirely of cash. According to Petrie, he never discussed the type of proof needed to satisfy the Sellers' proof of funds demand with either the Amundsons or with Amundson's broker, Argeres.

Argeres testified that when he received the Sellers' counteroffer, he contacted Anderson, the Sellers' broker, to clarify the meaning of the proof of funds provision. According to Argeres, Anderson told him that the Amundsons needed to show they had enough "cash now" to buy the Property. The Amundsons rely on this evidence to argue that their interpretation of the proof of funds provision is correct.

But this oral discussion was not translated into specific language in the proof of funds addendum. Under Washington law, a broker has no authority to construe contract language, and a principal is not bound by representations a broker may have made in that regard. Gile v. Tsutakawa, 109 Wash. 366, 375, 187 Pac. 323 (1920) (when there is no indication that the broker was given authority to modify the terms of an agreement, the broker's verbal representations construing the contract were not binding); see also Sound Built Homes, Inc. v. Windermere Real Estate/South, Inc., 118 Wn. App. 617, 625-26, 72 P.3d 788 (2003) (real estate agent has no authority to make contract to sell land); Larson v. Bear, 38 Wn.2d 485, 489-90, 230 P.2d 610 (1951) (same). Indeed, the Amundson PSA explicitly states that the Sellers' broker made no "representations or warranties . . .

- 13 -

concerning the legal effect of this agreement." Paragraph 22(a) of the Amundson PSA provided that "[t]his Agreement and any addenda and exhibits thereto state the entire understanding of Buyer and Seller regarding the sale of the Property. There are no verbal or other written agreements which modify or affect the Agreement." While extrinsic evidence is admissible to determine the parties' intent when they signed a contract, it is not admissible to add a term to a fully integrated contract. Donatelli v. D.R. Strong Consulting Eng'rs, Inc., 179 Wn.2d 84, 115, 312 P.3d 620 (2013). There is no indication that Anderson had the Sellers' express authority to define, and add to, the contractual terms. Thus, because the record demonstrates that Anderson lacked the ability to add clarifying terms to the PSA addenda, his statement regarding the meaning of the proof of funds contingency is nonbinding and inadmissible.

But the purpose behind the proof of funds contingency is relevant to the analysis. It was a condition precedent of both agreements—the Sellers had no obligation to close the sale transaction with either buyer unless the Sellers were satisfied with the buyer's financial ability to fund the purchase price.[4] In Matson, the court imposed "a duty of reasonableness and good faith when one party must perform to the satisfaction of the other party." 36 Wn. App. at 686. It stated that

---

[4] We reject the Tenants' contention that the contingency was just a contractual obligation, the performance or nonperformance of which has no bearing on the validity of the Tenants' exercise of their right of first refusal. A condition precedent is an event occurring after the making of a valid contract which must occur before a right to immediate performance arises. Jones Assocs., Inc. v. Eastside Properties, Inc., 41 Wn. App. 462, 466, 704 P.2d 681 (1985). Here, the Sellers had the right to walk from the agreement if the Tenants failed to prove their financial ability to close. The proof of funds contingency was a condition precedent of the contract and any failure to meet that condition would render the exercise of the right of first refusal void.

"[a]bsent findings of bad faith or unreasonableness, the property owner should retain primary control over disposition of the property." Id. at 687.

In this case, there is no evidence that the Sellers acted in bad faith or unreasonably when they considered the two purchasers' proof of funds and determined that the Tenants' financial resources were adequate. Anderson questioned the adequacy of the Tenants' proof of funds and advised the Sellers that he considered the Tenants' offer to be riskier than the Amundsons' offer because it was dependent on financing. But later that same afternoon, Petrie told Miller, the Tenants' attorney, that the Sellers were satisfied with the Tenants' loan commitment as long as they had adequate cash to bridge the gap between the loan and the purchase price. On July 14, 2016, Petrie spoke again with Miller regarding the Tenants' "cash" component and "loan" component of the proof of funds submission. Petrie told Miller that the Sellers were not concerned with the Tenants' ability to secure a loan. Moreover, Miller offered to supply additional information if the Sellers felt it necessary.

Petrie then met with the Sellers to discuss both purchase agreements after talking to Miller. Donnarae testified that, from her perspective, both the Amundsons and the Tenants had demonstrated their respective financial ability to close the sale. Whether Anderson, the Sellers' broker, felt the deal with the Tenants was riskier than the deal with the Amundsons does not create a genuine issue of fact as to the Sellers' satisfaction with the proof of funds provided by each party. Based on this record, we conclude that the Amundson PSA did not mandate a showing of "cash now" and that the Sellers had the discretion to accept the

Tenants' loan commitment letter as sufficient to demonstrate their financial resources to close. The record reveals no evidence that the Sellers acted in bad faith in doing so.

Next, the Amundsons argue that even if their PSA did not impose a "cash now" standard, the Tenants were unable to secure the loan funds they needed by the September 12, 2016, closing date. But this argument is not supported by the record.

Although Joshua Buckingham, a loan officer for Sound Community Bank, testified that he could not say whether the bank had an obligation to fund the Tenants' loan *before* September 12, 2016, an underwriter for the bank, Heather Lee, e-mailed the Tenants' attorney, Phil Miller, at 10:49 a.m. on September 12, 2016, indicating that the bank was ready to close and fund the sale.

The Amundsons correctly point out that Sound Community Bank did not fund the loan as planned. Laurie Stewart, the President and CEO of Sound Community Bank, testified that as of the morning of September 12, 2016, the Tenants had signed all required closing and loan documents, which had been reviewed and approved by the bank. But, "The one remaining unsatisfied condition was the requirement of receipt by the Bank of an acceptable title report." Stewart testified that the bank would not transfer the funds because the Amundsons had filed a *lis pendens* on the Property.

The Amundsons admit that the sole reason the bank did not fund the loan was the existence of their *lis pendens*, but they argue that if the Tenants had possessed $1.8 million in liquid assets, they could have closed the sale. But clear

title was a condition of this sale. Paragraph 12 of the Amundson PSA included a Seller representation that "[t]here is no pending or threatened litigation which would adversely affect the Property or Buyer's ownership thereof after Closing." If, before closing, the buyer discovered information that caused this representation to be false, the buyer had the right to terminate the agreement. When the Amundsons placed a cloud on the title by filing a *lis pendens* and initiating this lawsuit, the Tenants had no legal obligation to close, and the failure of the Tenants to tender $1.8 million on the closing date did not constitute a breach of their PSA with the Sellers or constitute a forfeiture of their right of first refusal.

    b. Assignment Clause

The Amundsons also challenge the assignment clause in the Tenants' PSA, arguing that it differed materially from the assignment clause in the Amundson PSA. Paragraph 20 of the two agreements was identical:

> Buyer ☐may ☒ may not (may not, if not completed) assign this Agreement, or Buyer's rights hereunder, without Seller's prior written consent, unless provided otherwise herein. If the "may not" option is selected and the words "and/or assigns" or similar words are used to identify the Buyer, then this Agreement may be assigned with notice to Seller but without Seller's consent only to an entity which is controlled by or under common control with the Buyer identified in this Agreement. Any other assignment requires Seller's consent. . . .

The Amundson PSA identified the "Buyer" as "Ron Amundson and or assigns." Because the "may not" option was selected, and the words "and or assigns" were used to identify the buyer, the Amundson PSA could be assigned only to an entity controlled by or under the common control of Ron Amundson. The parties broadened the assignment provision with the following language:

> Buyer, Ron Amundson, may only assign this contract to an LLC controlled by himself and/or his immediate family members.

- 17 -

This change allowed the Amundsons to assign the contract to an entity which their immediate family members controlled, even if Ron Amundson personally did not retain a controlling interest in that limited liability company.

The Tenants' PSA, like the Amundson PSA, identified the "Buyer" as "Kenneth Hartung, Beth Means, Travis & Staci Krant or assigns." As under the Amundson PSA, the Tenants could assign the agreement only to an entity in which they retained control. But the parties modified the assignment with an assignment addendum similar to that set out in the Amundson PSA:

> Buyer may assign this contract to a Washington non-profit corporation to be operated as a cooperative in which the named individuals comprising Buyer collectively own not less than a 50% interest.

This modification allowed the Tenants to assign the contract to a nonprofit entity as long as it operated as a cooperative and the four individuals named in the contract retained a combined ownership interest of at least 50 percent.

The trial court determined the assignment clauses were sufficiently similar to constitute a match:

> As a practical matter, each contract allows loss of control on the part of the buyers. The Amundsons could assign their entire interest to a family member and [the Tenants] could assign away 50% thereby losing control. Although the provision[s] do not mirror each other[,] they do not materially vary for the purposes of the seller's aims. . . . Here, rather than void the right of first refusal by holding it to an assignment restriction that was tailored to the Amundson's family situation, the sellers tailored [the Tenants'] agreement to meet their own needs to minimize closing risk . . . .

The Amundsons challenge this conclusion, arguing that their assignment rights were more restricted than those granted to the Tenants and that this was a

- 18 -

material variation. The Tenants contend that the language difference merely reflected the fact that the Amundsons are a married couple, whereas the Tenants collectively consist of two, unrelated couples. They also argue that both assignment provisions served the same purpose—to protect the interests of the seller "by restricting the assignment prior to closing to an assignee that may not have the ability to close the sale."

In Northwest Television Club, our Supreme Court recognized that the authority on what constitutes a material variation is "meager" and that results vary depending on the facts of each case. 96 Wn.2d at 980-81. In that case, Northwest Television leased an old mansion on Capitol Hill and held a right of first refusal. Id. at 974. The lessor notified Northwest Television that it had received a purchase offer from Dorland. Dorland's $90,000 offer was contingent on the sale of Dorland's Mercer Island residence within 90 days of the offer. Id.at 976. Northwest Television notified the lessor of its intent to exercise the right of first refusal for $90,000. Id. Its offer was conditioned on the sale of a home owned by the principal stockholder of the corporation within 90 days of the offer. Id. The lessor rejected this offer, and Northwest Television sought specific performance of its right of first refusal.

The Supreme Court found no material difference between two purchase agreements in which the purchase price was the same, the contingencies were the same (the sale of a residence), and the time of acceptance was the same. 96 Wn.2d at 981-982. The only difference between the two agreements was the property needing to be sold as a condition of closing. Id. The court held that it

made no sense to require the lessee to condition its offer on the sale of a home belonging to another individual because imposing such an "exact match" requirement on the lessee would render its right of first refusal illusory. Id. at 983.

As in Northwest Television, the two agreements matched in price, conditions, and time to close. It would make little sense to limit the Tenants' assignment rights to an LLC controlled by immediate family members because they are not all members of the same family. To impose such an "exact match" requirement here would render the Tenants' right of first refusal illusory.

Conversely, in Matson, this court refused to enforce a right of first refusal because the holder's offer of an all-cash sale differed materially from a third party's offer to exchange parcels with the seller and to pay the seller an additional $25,000 in cash. 36 Wn. App. at 685. It concluded that "[a]llowing a cash offer to be the equivalent of the property exchange offer, regardless of the factual situation, imposes a different contract on the parties and seriously infringes on the owner's right to dispose of the property." Id. The Matson court thus looked to whether the term at issue "imposed a different contract" on the seller.

Unlike in Matson, we conclude that the Tenants' assignment clause did not impose a different contract on the Sellers. As the trial court noted, both assignment provisions allowed the buyers to transfer their rights to an entity in which they held no majority control. The Amundsons were allowed to assign their rights to an LLC owned by Ron Amundson's immediate family members, while the Tenants were allowed to assign their rights to a nonprofit corporation in which the Tenants retained a 50 percent interest. Although a 50 percent interest is not a majority

interest, the Amundsons were not required to retain any interest in or control of the entity to whom they assigned their contract rights. The two assignment clauses did in fact serve the same purpose and were sufficiently similar under the facts of this case.[5]

### 3. Lis Pendens Statute

In their cross-appeals, the Sellers and Tenants argue that the trial court erred in denying the Sellers' request for prejudgment interest and the Tenants' request for attorney fees under the *lis pendens* statute, RCW 4.28.328. This statute provides:

> Unless the claimant establishes a substantial justification for filing the lis pendens, a claimant is liable to an aggrieved party who prevails in defense of the action in which the lis pendens was filed for actual damages caused by filing the lis pendens, and in the court's discretion, reasonable attorneys' fees and costs incurred in defending the action.

The Sellers argue the Amundsons lacked a substantial justification for filing a *lis pendens* and used it as a "weapon to prevent [the Tenants] from obtaining cash," so they could argue that the Tenants' right of first refusal was void. Under the *lis pendens* statute, "where the claimants have a reasonable, good faith basis in fact or law for believing they have an interest in the property, a lis pendens is substantially justified." S. Kitsap Family Worship Ctr. v. Weir, 135 Wn. App. 900,

---

[5] The Amundsons also assign error to the trial court's consideration of certain statements contained in declarations from Petrie and Miller. A trial court may not consider inadmissible evidence when ruling on a motion for summary judgment. King County Fire Prot. Dist. No. 16, v. Hous. Auth., 123 Wn.2d 819, 826, 872 P.2d 516 (1994). We presume the trial court disregarded any inadmissible evidence. See State v. Melton, 63 Wn. App. 63, 68, 817 P.2d 413 (1991) ("A trial judge is presumed to be able to disregard inadmissible evidence."). Assuming without deciding that the contested evidence was inadmissible and that this argument was properly preserved, the fact that inadmissible evidence was presented to the trial court, without more, does not require reversal of summary judgment. Cano-Garcia v. King County, 168 Wn. App. 223, 249, 277 P.3d 34, 49 (2012). The record shows no improper reliance on inadmissible evidence.

912, 146 P.3d 935 (2006). See Richau v. Rayner, 98 Wn. App. 190, 198, 988 P.2d 1052 (1999) (no substantial justification when claimants assumed that they had the rights to property without any factual basis to support such as belief); Keystone Land & Dev. Co. v. Xerox Corp., 353 F.3d 1070, 1075–76 (9th Cir. 2003) (interpreting Washington law, court held that substantial justification exists where a claimant relied on a valid and viable legal theory to file a *lis pendens*).

In this case, we conclude that the Amundsons had a substantial justification for filing the *lis pendens* on the Property. The Amundsons had a good faith basis in fact and law for believing the Tenants' PSA did not match theirs, that the Sellers had granted more beneficial sale terms to the Tenants because of their long-standing personal relationship, and that the Tenants' right of first refusal was void. That we conclude otherwise does not mean their position was not well-founded. Their legal theory was valid and viable. Even if the Amundsons sought to prevent the sale of the Property to the Tenants, we cannot conclude their motivation was wrongful. The Amundsons believed, in good faith, that they had the right to title to the Property and the *lis pendens* put the world on notice of their lawsuit and claim of right to title. We affirm the trial court's denial of prejudgment interest to the Sellers and attorney fees to the Tenants under RCW 4.28.328.

4. Attorney Fees on Appeal

The Sellers are entitled to an award of attorney fees and costs in defending the Amundsons' appeal under the attorney fee provision in the Amundson PSA,[6]

---

[6] The Amundson PSA provided: "If Buyer or Seller institutes suit against the other concerning this Agreement, the prevailing party is entitled to reasonable attorneys' fees and expenses. In the event of trial, the amount of the attorney's fee shall be fixed by the court."

subject to compliance with RAP 18.1. We deny the Sellers' request for attorney fees for their cross appeal because the assigned error relates solely to the filing of the *lis pendens*. Because we conclude that the Amundsons had a substantial justification for filing the *lis pendens* on the Property, the Sellers are not entitled to attorney fees for their cross-appeal under the *lis pendens* statute. We also deny the Tenants' request for attorney fees on appeal for the same reason.

Affirmed.

WE CONCUR:

Andrus, J.

Mann, ACJ

Appelwick, CJ